599 So.2d 827 (1992)
June Ledet BERGERON, Plaintiff,
v.
BLAKE DRILLING & WORKOVER COMPANY, INC., et al., Defendants.
James Mark LeBLANC & Kim LeBlanc, Plaintiffs,
v.
BLAKE DRILLING & WORKOVER COMPANY, INC., et al., Defendants.
Ronald E. SMITH & Mary Guidry Smith, Plaintiffs,
v.
BLAKE DRILLING & WORKOVER COMPANY, INC., et al., Defendants.
Nos. CA/1322/90C, CA/1323/90C and CA/1324/90C.
Court of Appeal of Louisiana, First Circuit.
March 31, 1992.
Rehearing Denied May 28, 1992.
*831 Michael J. Samanie, Houma, Robert J. Prejeant, Houma, James K. Carroll, New Orleans, Rufus C. Harris, III, New Orleans, George H. Robinson, Jr., Lafayette, Charles R. Talley, New Orleans, Ken E. Kendrick, Houston, Tex., D. Mark Bienvenu, Lafayette, Donald O. Collins, New Orleans, Camille A. Morvant, Thibodaux, George W. Healy, III, New Orleans, Marshall G. Weaver, Metairie, Daniel J. Walker, Houma, Michael T. Long, Simsburg, Conn., Kenneth Givens, Houma, Daniel A. Cavell, Thibodaux, for appellees.
Michael L. McAlpine and Joseph A. Race, New Orleans, David B. Allen, Charles Hanemann, Danny J. Lirette, Houma, June Ledet Bergeron, James M. and Kim LeBlanc, and William V. Renaudin, Jr. and Kenny M. Charbonnet, Metairie, Kevin O'Bryon, New Orleans, for appellants.
Before COVINGTON, C.J., and SAVOIE and LeBLANC, JJ.
SAVOIE, Judge.
This case arises out of a tragic accident which occurred on August 26, 1987. Two wireline employees were seriously injured and one employee was killed when some explosives prematurely detonated.

PROCEDURE
Suits were filed by June Ledet Bergeron, the spouse of the deceased employee, Clark Bergeron, and by the Bergeron children, Clark, Jr., Bonnie, and minors Travis and Cale; and by James Mark LeBlanc and his wife Kim; and Ronald Smith, his wife Mary and their children Sandra and Ronnie, Jr., both minors. (the two other injured employees and their families) Named as defendants in the suits were Perfco, the plaintiffs' employer; Linder Energy; Production Systems and Services (PSS); Blake Drilling & Workover Inc.; E.I. DuPont-DeNemours Company, Inc.; and Pengo Industries Inc.[1]

FACTS
Ronald Smith, the Perfco crew chief at the time of the accident, was a 39-year-old high school graduate. He had worked in the perforating business for approximately eighteen years. He spent two years receiving on the job training as a wireline helper and thereafter was promoted to logger shooter. He had worked for several wireline companies, including Aquatech, Gator Wireline, Western Company, Perforating Guns, Inc., and Perfco, Inc. On August 4, 1987, Smith was employed by Perfco, Inc. as a wireline operator. Smith was considered an experienced operator.
At the time of the accident, Clark Bergeron was 47 years-old. He had worked in the wireline industry since 1971. He was employed by Welex for approximately five years and subsequently was employed by Gearhart Industries, Inc. until 1982. While at Gearhart, Bergeron was employed as a wireline operator. He had attended various safety schools and received safety awards. In 1984, he obtained employment with Perfco. Although Bergeron had previously been a wireline operator, because of the downturn in the economy, he became a contract wireline helper, working on an "as needed" basis.
James Mark LeBlanc was a 33-year-old high school graduate who has been employed in the oil field since 1977. Approximately a year and a half prior to this accident, LeBlanc was employed by Perfco. His primary duties and experience were that of a slick line operator.
Perfco, Inc. is a perforating company which was formed in 1983. Perfco's clients include both major oil companies and independent operators. The surface equipment used by Perfco was manufactured by Gearhart. Perfco maintained and repaired its own equipment and installed subcomponents. *832 Perfco supplied a fully equipped crew. Linder Energy Company is a Louisiana corporation employing approximately twenty-five personnel, twelve geologists with the remainder employed as clerical staff. Linder was in the "oil business." At the time of the accident, Linder's expertise was limited to the construction of geological maps, the location of potential oil reserves and the purchasing of leases. Linder employs no personnel with expertise in oil field operations and owns no equipment that could be used in drilling operations. Once Linder has chosen a drilling site, the operation, in its entirety, is turned over to independent contractors such as Production Systems & Services, Inc.
P.S.S. is a Louisiana corporation specializing in workover and drilling operations. At the time of this accident, P.S.S. had between 15 and 20 clients, including both major oil companies and small independents like Linder. The degree of responsibility assumed by P.S.S. varies with the oil company for which it is working. Unlike the major oil companies, independents such as Linder have no familiarity with workover operations. Accordingly, in contracting with Linder, P.S.S. arranged all facets of workover operations.
Paul Bittle is considered to be an expert in workover operations. In 1981 he formed his own company, Paulo Enterprises. and has worked exclusively for P.S.S. P.S.S. assigned Bittle to Blake Rig No. 6 to act as the company man, coordinating various activities at the rig. While employed by P.S.S., Bittle has worked for approximately 20 different companies. Bittle established himself as a competent company man in workover operations. Linder did not specifically request that Bittle be assigned to Blake Rig No. 6. While working as a company man aboard Lake Rig No. 6, Bittle reported to P.S.S., took his orders from P.S.S. and was paid by P.S.S.

Background
Geologists at Linder determined that a potential oil reservoir was located at an intermittent level in LL & E No. 1, a well previously owned by Louisiana Land & Exploration. Linder purchased the lease from Foreman Exploration. Unlike the major oil companies, Linder has no personnel knowledgeable in workover operations nor any of the equipment necessary to conduct workover operations. Accordingly, Linder contracted for Production Systems & Services, Inc., a specialist in workover and drilling operations, to complete LL & E No. 1.
P.S.S. has previously conducted workover operations for Linder. According to Mike Jeansonne, president of P.S.S., Linder, unlike the major oil companies, "needed everything." P.S.S. was given full authority to draft the prognosis, retain vendors and provide on-site coordination and supervision as needed.
In conjunction with the workover operations, P.S.S. contacted Perfco, Inc., a specialist in perforating operations. Perfco submitted its bid to P.S.S., reported to P.S.S. and obtained all of its directions from P.S.S.
On August 25, 1987, the Perfco crew arrived aboard Blake Rig No. 6 to perforate the well. Blake Rig No. 6 is a drill barge, a vessel which was floated to the location in Rice Bayou. The well was located in a dead end canal. The Perfco crew was transported to the rig by crew boat since this location was accessible only by vessel or seaplane. The Perfco equipment has previously been transported to the rig by barge. Once the perforating operations commenced, Perfco assumed control of the drilling floor, and all non-essential personnel were removed because of the dangerous nature of the operations.
The Perfco crew experienced two misruns. They extracted the perforating gun from the well and attempted to repair the equipment. Smith grounded the blasting cap with a wire. Smith then contacted his office and requested additional collar locators.
Prior to the arrival of the additional equipment, Mark LeBlanc attempted to repair the collar locator on the rig. The crew then attempted a third run. Smith removed the stripped wire from the gun, arming it. When the three men attempted to connect the armed perforating gun to the tool string, it exploded.
*833 At the outset of trial, plaintiffs attempted to establish that the Blake rig radio was in use at the time of the perforating operation and caused or contributed to the accident. Plaintiffs premised their theory on the fact that William Trosclair, sales representative for Perfco, spoke with the rig at 2:18 p.m. The explosion occurred at "approximately" 2:20 p.m.
Evidence indicated that Trosclair had spoken with Paul Bittle, the P.S.S. company man. However, Bittle was in bed at the time of the explosion. Moreover, both Darrin Small, the gauger, and Raywood Dubois, the tool-pusher, were in the Blake rig office and testified that the telephone was not in use at the time of the explosion or immediately thereafter.
In addition to the factual testimony above, expert testimony established that the radio was capable of producing only 1/32 of the power required to detonate the Dupont E97 blasting cap. As the evidence clearly showed that the radio could not have caused or contributed to the accident, the plaintiffs attempted to establish liability on the part of Linder Energy Company through Paul Bittle, the company man employed by P.S.S. aboard Blake Rig No. 6.
Plaintiffs argue that perforating constitutes an ultrahazardous or inherently dangerous operation. The record contains sufficient evidence to support the criteria necessary to establish that perforating is an ultrahazardous activity and/or an intrinsically dangerous activity.
Perforating is a common activity in the oil field industry, occurring more than 100 times a day on a worldwide basis. Given the number of perforating operations, accidents are rare. However, the paucity of accidents does not lessen or abate the inherently dangerous nature of the activity.
Plaintiffs allege that there occurred "a moment of truth" during the perforating operation in which the perforating crew was exposed to a potential hazard beyond their control. They argue that such a moment creates an ultrahazardous or intrinsically dangerous situation thereby imputing the negligence of an independent contractor to its principal.
Defendants contend that the accident was caused by Plaintiff's and/or Plaintiff's Employer's violation of their own safety rules and/or defects in the gun or components thereof.

ACTION OF THE TRIAL COURT
Before trial, the plaintiffs settled with Blake Drilling. Trial took place before a jury from July 5, 1989 through August 10, 1989. Several directed verdict motions were made during the trial. Linder moved for a directed verdict contending that the plaintiffs failed to prove causation; this motion was denied. DuPont moved for a directed verdict on the basis that the plaintiffs failed to prove causation; the trial judge granted the motion. The plaintiffs moved for a directed verdict contending that Linder was strictly or absolutely liable for the damages arising from an ultrahazardous activitydetonation of explosives. The trial judge granted the plaintiffs' motion. The Bergeron and LeBlanc plaintiffs moved for a directed verdict on the grounds that Bergeron and LeBlanc were not guilty of any comparative negligence. The trial judge granted the motion.
In all three cases, the trial judge rendered judgment finding Pengo not liable and dismissing the plaintiffs' demands against Pengo; the intervenor's demand against Pengo and all incidental demands against Pengo were dismissed. The jury also found Blake free of any negligence. The jury found Perfco was at fault as well as Linder and PSS and fault on the part of Smith. The percentages of fault were as follows: Linder, 20%; PSS, 25%; Smith, 10%; and Perfco, 45%. Perfco, as the employer of plaintiffs, was not held liable for any damages in tort.
The following damages were awarded to the Bergerons against Linder and PSS in solido: June Ledet Bergeron was awarded $1,519,144.75; as tutrix of her minor child Cale, Ms. Bergeron was awarded $200,000.00; Clark Bergeron, Jr. was awarded $100,000.00; Bonnie Brien was awarded $100,000.00; Travis Bergeron was awarded $150,000.00. These plaintiffs were also *834 awarded legal interest from date of judicial demand and all costs. A separate judgment was also rendered for intervenor Liberty Mutual Insurance Company against Linder, Certain Underwriters at LLoyds, London, as Linder's insurer, PSS, and Certain Underwriters at Lloyds, London, as insurer of PSS. James Mark LeBlanc was awarded total damages of $5,478,152.59 together with legal interest from date of judicial demand and costs against Linder, Lloyds, PSS, and Lloyds. Kim LeBlanc was awarded damages of $645,000.00 against these same defendants. James Mark LeBlanc's judgment was subject to the intervention of Liberty Mutual Insurance Company for $242,114.46. Ronald Smith and his family were awarded damages of $2,750,000.00. Ronald Smith was awarded damages of $1,932,331.98 against Linder, Lloyds, PSS, and Lloyds. Mary Guidry Smith was awarded damages of $450,000.00; as tutors of Sandra Smith, Mr. and Mrs. Guidry were awarded damages of $90,000.00 and as tutors of Ronald Smith, Jr., damages of $90,000.00 more in judgment. Ronald Smith's judgment was subject to the intervention of Liberty Mutual Insurance Company in the sum of $141,130.95. At the trial at the close of the plaintiffs' case in chief, DuPont moved for and was granted a motion for a directed verdict.

ASSIGNMENTS OF ERROR RAISED BY LINDER
1. The trial judge erred in applying Louisiana law rather than general maritime law.
2. The trial judge erred in holding that Linder was strictly or absolutely liable for the plaintiffs' claims.
3. The trial judge erred in holding that the plaintiffs' injuries were due to an ultrahazardous activity for which Linder was strictly liable.
4. The trial judge erred in denying Linder's motion for directed verdict on the issue of causation.
5. The trial judge erred in granting the plaintiffs' motion for a directed verdict on the issue of comparative fault and in finding Smith to be only 10% at fault.
6. The trial judge erred in several evidentiary rulings which unduly prejudiced Linder and which constituted reversible error.
7. The trial judge erred in charging the jury as to negligence, standard of care, and ultrahazardous activity.
8. The trial judge erred in not granting a remittitur because the damages were excessive.

ASSIGNMENTS OF ERROR RAISED BY PSS
PSS raised Linder's Assignment of Error Nos. 1, and 3-8. PSS also raised the following as error in Assignment of Error No. 2: "Casting a joint tortfeasor in judgment for the full amount of a claimant's damages, without credit for the percentage of damages caused by the fault of the plaintiff's statutorily immune employer, violates the constitutional guarantees of equal protection and due process to the joint tortfeasor."

ANSWER TO APPEAL RAISED BY GOEX
Goex, Inc., answers the appeal only in the event that this court disturbs the ruling of the trial judge in favor of Goex. Goex asserts that it is entitled to judgment on its cross-claim and third party demand against the third party defendants. Goex further contends that the damages were excessive and the case should be remanded for a new trial because the jury viewed prejudicial evidence. This court ruled October 26, 1990 that Goex, Inc. is not before this court in this matter therefore we will not address Goex, Inc.'s answer to appeal.

ASSIGNMENTS OF ERROR RAISED BY PENGO
Pengo raises no assignments of error unless the judgment is changed on appeal in any way adverse to Pengo. If so, Pengo adopts the assignment of errors raised by Linder, and adds to those the failure of the trial judge to grant Pengo's motion for directed verdict. Because our ruling herein *835 does not adversely affect Pengo, we will not address its Assignments of Error.

ASSIGNMENTS OF ERROR RAISED BY THE PLAINTIFFS
1. The trial court erred in denying the plaintiffs' motion for judgment notwithstanding the verdict that Bittle was an employee of Linder.
2. The plaintiffs contend the trial judge erred in directing a verdict for DuPont, the manufacturer of the blasting cap.

ASSIGNMENT OF ERROR NO. 1 RAISED BY LINDER AND PSS
PSS first contends that the trial judge erred in applying Louisiana state law rather than federal maritime law. As earlier stated, the plaintiffs were injured on August 26, 1987, when a perforating gun being readied for use prematurely detonated. The explosion occurred aboard the inland drill barge Blake Rig No. 6, upon which Perfco was performing workover operations for Linder at LL & E Well No. 1 located in the dead end canal off the navigable waters of Rice Bayou in Terrebonne Parish. Perfco was a subcontractor to PSS; PSS had contracted with Linder to perform the total workover operation. The perforation job to have been performed by Perfco involved the lowering of explosive devices into the hole, where they were to be electronically detonated at predetermined depths. The explosive device prematurely detonated at the surface of the well.
Based on these facts, Linder and PSS argue that the plaintiffs' claims arose out of personal injuries sustained while on navigable waters aboard a vessel in navigation and while the plaintiffs were engaged in maritime employment. Linder and PSS contend that the claims should be governed solely by admiralty law. A state court hearing a claim arising in admiralty may not apply state law if it conflicts with or expands the federal admiralty law. In this case, if admiralty law applied, the judge could not have charged the jury that a principal (Linder and/or PSS) was strictly liable for the negligence of a subcontractor engaged in ultrahazardous activities.
In Executive Jet Aviation, Inc. v. City of Cleveland, 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972), and Foremost Insurance Co. v. Richardson, 457 U.S. 668, 102 S.Ct. 2654, 73 L.Ed.2d 300 (1982), the Supreme Court set forth two requirements for admiralty jurisdiction: maritime locality and maritime flavor.
We find that maritime locality is not a problem in the case sub judice. As Linder correctly points out in brief, Blake Rig No. 6 was located in a manmade canal excavated to allow access to the well site. Thus, the canal was a navigable waterway. Blake Rig. No. 6 was a vessel for purposes of federal maritime jurisdiction.
The main issue in this case is whether sufficient maritime nexus existed to invoke maritime jurisdiction.
The United States Supreme Court's most recent pronouncements concerning admiralty jurisdiction were in Sisson v. Ruby, 497 U.S. 358, 110 S.Ct. 2892, 111 L.Ed.2d 292 (1990). The court held that admiralty jurisdiction was present in a tort action where an owner of a pleasure yacht filed suit to limit his liability for damages for a fire which began on his moored yacht, destroying the yacht and extensively damaging the marina and several neighboring boats. The yacht was on navigable waters in a recreational marina. The Court referred to its earlier holdings in Foremost Insurance Co., and in Executive Jet, where the court decreed that to have maritime jurisdiction, there must be maritime locality and maritime nexus. In Sisson, citing Foremost, the Court said, "`[n]ot every accident in navigable waters that might disrupt maritime commerce will support federal admiralty jurisdiction, .... but ... when a `potential hazard to maritime commerce arises out of activity that bears a substantial relationship to traditional maritime activity, ... admiralty jurisdiction is appropriate.'" Sisson, 110 S.Ct. at 2895 (Emphasis ours). The Court further stated as to the first half of the testthat there be potential hazard to maritime commerce, "[A] court must assess the general features of the *836 type of incident involved to determine whether such an incident is likely to disrupt commercial activity. Here, the general featuresa fire on a vessel docked at a marina on navigable watersplainly satisfy the requirement of potential disruption to commercial maritime activity." Sisson, 110 S.Ct. at 2896, according to the Court, in answering the first half of the test, one does not look at the actual effects on maritime commerce or the particular facts about the incident that may have rendered it more or less likely to disrupt commercial activity. The Court said that under the second half of the Foremost test, where the party seeking to invoke admiralty jurisdiction must show a substantial relationship between the activity giving rise to the incident and traditional maritime activity, the court must first determine the relevant activity. To make this determination, the court must look not at the particular circumstance of the incident but at the general conduct from which the incident arose. The Court in a footnote discussed the four factor test previously used by the Fifth Circuit and set forth in its case, Kelly v. Smith, 485 F.2d 520, 525 (5th Cir.1973), cert. denied, 416 U.S. 969, 94 S.Ct. 1991, 40 L.Ed.2d 558 (1974). The factors are "the functions and roles of the parties; the types of vehicles and instrumentalities involved; the causation and the type of injury; and traditional concepts of the role of admiralty law." The Court then added that the "precise state of the law in the Fifth Circuit after Foremost is also unclear."[2] 110 S.Ct. at 2897, Ftn. 4. The Court declined to adopt the test set forth in Kelly for determination of admiralty jurisdiction, stating, "We believe that, at least in cases in which all of the relevant entities are engaged in similar types of activity (cf. n. 3, supra), the formula initially suggested by Executive Jet and more fully refined in Foremost and in this case provides appropriate and sufficient guidance to the federal courts." 110 S.Ct. at 2897 ftn. 4. In deciding whether maritime jurisdiction was appropriate in the Sisson case, the Court noted that navigation was not the only activity sufficient to confer admiralty jurisdiction, and added that "[t]he fundamental interest giving rise to maritime jurisdiction is `the protection of maritime commerce,' and ... `that interest cannot be fully vindicated unless all operators of vessels on navigable waters are subject to uniform rules of conduct,'. The need for uniform rules of maritime conduct and liability is not limited to navigation, but extends at least to any other activities traditionally undertaken by vessels...." 110 S.Ct. at 2898.
PSS and Linder compare the facts of Sisson to the facts of this case. They argue that the general features of an explosion aboard a vessel on navigable waters have as much potential to disrupt commercial activity as did the fire aboard the vessel in Sisson. They further argue that a substantial relationship exists between the exploration for minerals from a vessel in navigable waters and traditional maritime activity.
Applying the Sisson test to the case sub judice, the general features of the incident are an explosion on a drilling barge in a navigable but dead end canal. The second part of the test is that the activityperforating a hole at an oil well-sitemust be substantially related to traditional maritime activity.... PSS cites several cases in support of its contention. The lead case PSS cites is Pippen v. Shell Oil Co., 661 F.2d 378 (5th Cir.1981). In Pippen, the issue was whether the plaintiff, a wireline operator who fell while lifting explosives, was entitled to recovery under the Longshoreman Harbor Worker's Compensation Act (LHWCA). To recover under LHWCA, a plaintiff must be injured on navigable water (situs) and engaged in maritime employment (status). In Pippen, situs was not at issue, only status. The Fifth Circuit found that offshore drilling was maritime commerce, that the plaintiff's work was to facilitate maritime commerce since its purpose was to enable the vessel to perform offshore drilling, and that the work facilitated maritime commerce; therefore, the *837 plaintiff was engaged in maritime employment. In a footnote, the court distinguished Sohyde Drilling & Marine Co. v. Coastal States Gas Producing Co., 644 F.2d 1132 (5th Cir.1981). In Sohyde, the Fifth Circuit found that admiralty jurisdiction under the Admiralty Extension Act, 46 U.S.C.A. § 740, was not present in a suit for property damage arising out of the blowout of a high pressure gas well which occurred when the defendant was performing workover operation's on the plaintiff's gas well aboard a submersible drilling barge. "In large part, Sohyde Drilling is inapposite to the issue before this Court whether Pippen was engaged in maritime employment at the time of his injury and thus satisfies the status test of the LHWCA. The question facing the Sohyde Drilling Court was whether the wrong assertedthe injury complained ofbore a significant relationship to maritime activity. The Court need not decide whether Pippen's injury bore a significant relationship to maritime activity.... The factors considered by the Sohyde Drilling Court to determine whether the wrong bore a significant relationship to maritime activity for purposes of the Admiralty Extension Act have not been applied in cases that considered whether an employee was engaged in maritime employment for purposes of the LHWCA." Pippen, 661 F.2d at 384, n. 10. The court stated that it was not looking at the injury's relationship to maritime activity, but to the relationship to maritime activity of the work in which the plaintiff was engaged when injured. The court continued to say that although the plaintiff's job "was not itself peculiarly maritime in nature," its purpose was to facilitate maritime commerce.
We note that in Rohde v. Southeastern Drilling Co., Inc., 667 F.2d 1215 (5th Cir. 1982), the court dealt with the issue of whether offshore drilling operations were maritime activities sufficient to meet the Executive Jet criteria. In support of his contention that an accident on a fixed offshore drilling platform on the high seas was within general maritime jurisdiction, the plaintiff cited the Pippen and Boudreaux v. American Workover, Inc., 680 F.2d 1034 (5th Cir.1982) cases. The court found that the eligibility for LHWCA as decided in Pippen and Boudreaux was not the same as the application of general maritime jurisdiction.
Linder, in addition to relying on Pippen, also relies on Thornton v. Brown & Root, Inc., 707 F.2d 149 (5th Cir.1983), Thornton concerned the issue of whether employees were engaged in maritime employment under LHWCA where the employees were employed to help build offshore platforms and living quarters for offshore platforms. The court in Thornton stated, citing Pippen, "It is firmly established in this Circuit, then, that' [o]ffshore drillingthe discovery, recovery, and sale of oil and natural gas from the sea bottomis maritime commerce" 707 F.2d at 153. We note that Thornton was decided before the U.S. Supreme Court reversed Herb's Welding, which had expressly followed Pippen and Theriot v. Bay Drilling Corp., 783 F.2d 527 (5th Cir.1986). To support its contention that wireline perforating is a maritime activity, Linder distinguishes several cases where the courts found maritime jurisdiction was inapplicableSohyde Drilling, and Thurmond.
The plaintiffs contend that Pippen has been overruled by Herb's Welding, Inc. v. Gray, 470 U.S. 414, 105 S.Ct. 1421, 84 L.Ed.2d 406 (1985). In Herb's Welding, the Supreme Court determined that a plaintiff who was welding on a fixed offshore platform was not entitled to LHWCA; the Court found that the plaintiff was not engaged in maritime employment because he was not loading and unloading. The Court discussed Gray's work: "He built and maintained pipelines and the platforms themselves. There is nothing inherently maritime about those tasks. They are also performed on land, and their nature is not significantly altered by the marine environment, particularly since exploration and development of the Continental Shelf are not themselves maritime commerce ... To hold that Gray was necessarily engaged in maritime employment because he was not everyone on a covered situs automatically *838 satisfies the status test." Herb's Welding, 105 S.Ct. at 1428 (footnote omitted).
We note that in Union Texas Petroleum v. PLT Engineering, 895 F.2d 1043 (5th Cir.1990), the Fifth Circuit decided that a contract to design, fabricate and install a gas transportation system from a platform to a pipeline was not maritime, the court rejected as controlling the Theriot case because it predated Herb's Welding. The Fifth Circuit instead followed Thurmond v. Delta Well Surveyors, 836 F.2d 952 (5th Cir.1988), which stated, "`the principal obligation under this contract was to perform wireline services, clearly a nonmaritime obligation in the sense that it does not concern the operation of the vessel. Such services are peculiar to the oil and gas industry, not maritime commerce.'" Union Texas Petroleum v. PLT Engineering 895 F.2d at 1050.
We find Union Texas Petroleum v. PLT Engineering controlling herein. The electronic detonation in an oil pipe at a drilling site is an activity peculiar to the oil and gas industry, not maritime commerce. Therefore, applying the test of maritime locality and maritime nexus set out Sisson, we find no maritime nexus and therefore find no merit to this assignment.

ASSIGNMENTS OF ERROR NO. 2 RAISED BY LINDER
For the reason assigned in Assignment of Error No. 1, we find no merit in Assignment of Error No. 2.

ASSIGNMENTS OF ERROR NO. 3 RAISED BY LINDER AND PSS
Linder assigns as error the trial judge's directed verdict that the plaintiffs' injuries were caused by an ultrahazardous activity. The employer of the plaintiffs was Perfco. The relationship between Linder and Perfco was one of independent contractor and principal. Under Louisiana law, a principal is generally not liable for the offenses an independent contractor commits in the course of performing its contractual duties. (citations omitted) Triplette v. Exxon Corp., 554 So.2d 1361, 1362 (La.App. 1st Cir.1989). One exception to this general rule is that a principal may not avoid liability for injuries resulting from an ultrahazardous activity by hiring out work to an independent contractor. Triplette v. Exxon Corp., 554 So.2d at 1362 (citations omitted). Since the trial court directed the verdict in favor of plaintiffs that Linder was engaged in an ultrahazardous activity, Linder was absolutely liable for the plaintiffs' injuries.
The issue presented to this court is whether the plaintiffs were injured as a result of an ultrahazardous activity in which Linder was engaged. Linder argues that this court should use the three part test which was stated by this court in Triplette when it decided whether an activity was ultrahazardous.
In Triplette v. Exxon Corp., 554 So.2d at 1362, the court stated that the following elements are used to determine whether an activity is ultrahazardous; the activity must relate to land or some other immovable; the activity itself must cause the injury, and the defendant must be engaged directly in the injury producing activity; the activity must not require substandard conduct to cause injury. This third element requires that the activity "can cause injury to others, even when conducted with the greatest prudence and care", Triplette v. Exxon, 554 So.2d at 1362. In Triplette, our court decided whether the defendant was engaged in an ultrahazardous activity on the issue of whether the activity's risk of harm could be eliminated through due care to be the salient issue in the case sub judice.[3]
A wireline crew fabricates its own perforating gun. The gun consists of high *839 explosives and a blasting cap to detonate the shaped charges. The wireline crew attaches the gun to the end of a long cable, wireline, and lowers the gun into the well. When the perforating gun reaches the desired depth, the wireline crew via a generator applies electricity to the blasting cap via electrical conductors in the wireline. The electrical current detonates the blasting cap which in turn detonates the shaped charges which perforate the well.
The allegation that an electrical current caused the premature detonation is undisputed. What is disputed is the source of the electrical current that caused the detonation and whether adherence to certain safety procedures would have prevented the detonation. The record is replete with safety procedures that should be followed by a perforating crew but there is also testimony in the record that the use of these procedures will not take all the risk of harm out perforating. What lends weight to the position that the safety procedures are ineffective is the testimony that other workers in the perforating business use the same procedures as the plaintiffs were using when the detonation occurred without incident. We find that although there are numerous safety procedures to protect the crew that there is still a period of time during perforating when safety procedures are of no moment.
We find at the minimum that even if one found that perforating was not ultrahazardous a finding that perforating is a inherently and intrinsically dangerous work is unavoidable. In Thompson v. Petrounited Terminals, Inc., 536 So.2d 504, 512 (La. App. 1st Cir.1988), writ denied 537 So.2d 212-213 (La.1989), the court held that an employer cannot avoid liability by letting out inherently or intrinsically dangerous work to an independent contractor. The court stated "[T]he expert testimony revealed that toluene is a highly explosive chemical as well as an asphyxiant and intoxicant, which can cause severe or fatal injuries when inhaled. These propensities combined with the slightest human error or misjudgment culminate in disaster.... Thompson, 536 So.2d at 513." As we stated above, the effectiveness of the safety procedures are questionable. The uncertainty of the safety procedures combined with the fact the intended use of the charges of the perforating gun is to explode, leads us to no other conclusion but that perforating is a intrinsically and inherently dangerous work."
Linder tries to distinguish Thompson, from the case sub judice on several different grounds. In Thompson, the court found that the activity which caused the damage was inherently and intrinsically dangerous and that the principal owed a duty to make sure that the activity was carried safely. In Thompson v. Petrounited Terminals, Inc., 536 So.2d at 515, this court when summing up the liability of the principal stated:
"We further find that the unsafe methods used by Serv-Tech were implied authorized by Petro by their failure to provide any guidelines on tank entry and cleaning, their failure to discuss and approve the methods used by Serv-Tech, and their failure to monitor the activities of Serv-Tech. We find Petro equally at fault with Serv-Tech and accordingly amend that portion of the trial court's judgment."
We see nothing to distinguish the case sub judice from Thompson. Perforation of an oil well pipe by explosives like cleaning a confined area filled with explosive gases is inherently and intrinsically dangerous activity. Linder had an affirmative duty to investigate, discuss and approve the method of its contractor, Perfco just as the contractor in Thompson.
Thus, Linder is held either absolutely liable for engaging in a ultrahazardous activity or liable for the negligence of Perfco and itself because they were both engaged in an inherently and intrinsically dangerous work.
With regard to the second part of the test enunciated in Triplette, Linder argues that blasting did not cause the plaintiffs' injuries but that the injuries were instead caused by a premature, unintended explosion of the perforating gun. In sum, Linder contends that the preparation of the *840 perforating gun is not an ultrahazardous activity. We do not agree. Linder further argues that the accident was caused by the faulty preparation for an ultrahazardous activity which it considers separate from the ultrahazardous activity of detonation. We find the preparation inseparable from the blasting itself because the greatest risk of injury in the entire activity is when the explosives are on the surface.
Additionally, Linder argues that it was not engaged in the ultrahazardous activity. We see no error in the finding that the defendant was directly engaged in the injury producing activity. A well cannot produce oil or gas unless it is perforated. Thus, perforation is an internal and indispensable element of every well. That Linder chose to contract perforation out to a sub-contractor, is of no importance because perforation remained an internal and indispensable element of Linder's business.
Linder relies on the case of Shook v. Cambridge Mutual Fire Insurance Company, 451 So.2d 1298 (La.App. 1st Cir.1984) writ denied 458 So.2d 122 (La.1984) for the proposition that the defendant must be engaged in a ultrahazardous activity for it to be absolutely liable. In Shook, the plaintiff was cutting down a tree for his Masonic Lodge brother. After the tree was cut down, the tree rolled onto the plaintiff and the plaintiff suffered injuries. The court when treating the ultrahazardous theory advanced by plaintiff stated that the ultrahazardous theory applies when the defendant is engaged in an ultrahazardous activity. The court found in Shook that if the activity was ultrahazardous, it was plaintiff not defendant who was engaged in it. We find no merit to Linder's reliance on Shook. The record leaves no doubt that Linder was involved in the field of perforating because it could not accomplish its work as an oil company without it. We find no merit to this assignment.

ASSIGNMENT OF ERROR NO. 4 RAISED BY LINDER AND PSS
This assignment of error deals with the Trial Court's denial of Linder's motion for directed verdict on causation. Linder argues that plaintiffs did not prove the cause of the explosion and therefore did not prove Linder was responsible and thus Linder cannot be held liable for same.
Liability for ultrahazardous activities, on the other hand, involves different considerations than liability under C.C. Art. 2317 for creating or maintaining a thing which presents an unreasonable risk of harm. There are reasonable and still high enough that the party ought not undertake the activity without assuming the consequences. Such activities include pile driving, storage of toxic gas, blasting with explosives, crop dusting with airplanes, and the like, in which the activity can cause injury to others, even when conducted with the greatest prudence and care. 2 F. Harper and F. James, The Law of Torts, 14.4 (1956); W. Prosser, The Law of Torts 78 (4th ed. 1971). For these particular activities, Louisiana courts have imposed an absolute liability (as contrasted to the strict liability previously discussed), Which virtually makes the enterpriser an insurer. The enterpriser, whether or not negligent in any respect, causes the damage, and the injured party recovers simply by proving damage and causation. In these cases of absolute liability (or liability without proof of negligence or other fault), liability is imposed as a matter of policy when harm results from the risks inherent in the nature of the activity are not relevant to the determination of liability. (emphasis ours) Kent v. Gulf State Utilities Company, 418 So.2d 493, 498 (La.1982).
The word, causation, underlined in the above quotation refers to causation of the injury not causation of the explosion.
Under Louisiana jurisprudence, the activities named in the above quotation almost invariably resulted in the enterpriser, Linder in this case, being held liable. We see no reason to find this matter an exception.

ASSIGNMENT OF ERROR NO. 5 RAISED BY LINDER AND PSS
Linder argues that the trial court was manifestly erroneous in granting plaintiff's *841 motion for directed verdict on the issue of the comparative fault of plaintiffs, Clark Bergeron and Mark LeBlanc.
The standard of appellate review of a directed verdict is whether upon viewing the evidence submitted, the appellate court concludes reasonable people could not reach a contrary verdict. See Villaronga v. Gelpi Partnership No. 3, 536 So.2d 1307, 1309 (La.App. 5th Cir.), writ denied, 540 So.2d 327, 329 (La.1989). At the conclusion of trial, the trial judge granted plaintiffs', Bergeron and LeBlanc, motion for a directed verdict based on a finding that they were not guilty of comparative negligence.
In Linder assignment No. 3, we affirmed the trial court ruling that Linder and Perfco were engaged in an ultrahazardous activity which caused plaintiffs' injury. The record clearly reflects that Bergeron and LeBlanc were not supervisory personnel for Perfco but only helpers for the foreman, Smith. Additionally, the record does not reflect that either Bergeron or LeBlanc took any action independent of Smith's direction. From the record before us, we find that reasonable minds could not differ on the trial court's finding that there was no comparative fault on the part of plaintiffs, Bergeron and LeBlanc were only doing their best to complete their assigned task.

ASSIGNMENT OF ERROR NO. 6 RAISED BY LINDER AND PSS
By this assignment Linder and PSS complain of numerous evidentiary rulings. We preface our discussion of the various arguments by noting it is axiomatic that the trial judge has much discretion in ruling on the admissibility of evidence, and absent a clear abuse of discretion his ruling will not be disturbed. See Citizen's Bank & Trust Co. v. Consolidated Terminal Warehouse Inc., 460 So.2d 663 (La.App. 1st Cir.1984).

A. Shell and Texaco Manuals
Under this subheading Linder and PSS complain that the court should not have admitted into evidence certain manuals governing perforation operations. The manuals admitted were those of Shell Oil Co. and Texaco, Inc. for their own operations. Linder and PSS argue that the manuals were irrelevant and hearsay. Plaintiffs argue that the manuals were needed to establish the standards of care in the industry and as such relevant. Plaintiff further argue that the written rules were not hearsay but were admitted pursuant to the testimony of their expert C.F. Kimball.
"Relevant evidence is evidence having any tendency to make the existence of any fact that is of consequence to the determination of action the more probable or less probable than it would be without the evidence." Ketcher v. Illinois Central Gulf R. Co., 440 So.2d 805 at 810 (La.App. 1st Cir.1983), writ denied, 444 So.2d 1220 and 444 So.2d 1222 (La.1984).
Whether or not defendants were at fault, and to what degree, was a decision to be made on the facts. Most assuredly, the standard of care adhered to by the oil industry was crucial in establishing whether or not the defendants met that standard. Failure to meet such standards would tend to prove the existence of fault as more probable than not. We find no abuse of discretion.
As to hearsay, we find that the manuals formed the basis for the testimony of Kimball, the plaintiff's expert, and as such was clearly not hearsay. Identification of the sources on which the experts testimony is based is not hearsay. Introduction of the manuals for identification with Kimball's testimony was not, in the matter sub judice, error.

B. The Tenneco Manual
Linder and PSS objected to the introduction of the Tenneco manual for the same reason as the Shell and Texaco manuals. For the same reasons stated above we find no error. Additionally, Linder and PSS objected to the introduction of this manual on the grounds that it was not disclosed in the pre-trial statement. Even if we were to agree with this argument by *842 defendants it would not be grounds for reversal since the evidence was cumulative and not dispositive. Regardless, the trial court has much discretion in determining whether to allow evidence not listed in the pre-trial order. Levy v. Our Lady of the Lake Regional Medical Center, 546 So.2d 592 (La.App. 1st Cir.1989), writ denied, 550 So.2d 653 (La.1989).

C. The OSHA Report
Defendants, Linder and PSS, argue that the trial court erred in failing to admit the OSHA report. They argue that it was just as relevant and admissible as the Texaco, Shell and Tenneco Manuals, since the OSHA report was relevant to allocation of fault among the litigants. We tend to agree that the trial court erred in holding the report inadmissible. We do not find, however, that the trial court's ruling was reversible error. Defendants state that the OSHA report reflects numerous violations by Perfco. The jury assigned 45% fault to Perfco based on the evidence submitted. The OSHA report was at best cumulative as to Perfco. We find that defendants were not prejudiced by this ruling.

D. Testimony of Donald Fitzgerald
Donald Fitzgerald was called as a rebuttal witness by plaintiffs. He was not listed as a witness in the pre-trial order. Over the objection of defendants the trial court allowed his testimony, on the ground that he was a rebuttal witness and therefore was not required to be listed in the pre-trial order. We find no error to this ruling.

E. Responsibility of the Oil Company
Herein defendants argue that Fitzgerald's testimony as to the standards of care in the oil industry constituted "law or the ultimate conclusion of fact to be determined by the jury." We do not agree. We have previously held that evidence as to the standard of care in the industry was admissible. Fitzgerald, as an expert witness, could give his opinion as to the standard of care prevalent in the industry.

F. The Coroner's Video
Defendants argue herein that, because of the gruesome scenes in the coroner's video, "it should have been excluded on the grounds that its probative value was substantially outweighed by its prejudicial effects." Prior to admission into evidence, the trial judge viewed the coroner's video and determined that its probative value outweighed its prejudicial effect. Clearly this video, taken by a third party, was admissible since it accurately reflected the accident scene, the severity of the explosion and the resultant injuries. We also find that the video could have had a prejudicial effect on the jury. The balancing test of admissibility vis a vis prejudicial effect must be done on a case basis. The trial judge is in the best position to make such a determination. We cannot say the trial judge's determination was error.

G. Photographs and Videotape of Mark LeBlanc
Defendants assign as error the admission of enlarged color photographs and a video of the injuries and treatment of Mark LeBlanc. Defendants argue that these depictions were intended for and used for shock value not for their probative value. The injuries and treatment of Mark LeBlanc form the basis for awards of physical and mental pain and suffering as well as disability. We agree that the photographs and video are prejudicial. However, for the same reasons cited above for admission of the coroner's video, we cannot say that the trial judge erred in allowing the video and picture into evidence.

ASSIGNMENT OF ERROR NO. 7 RAISED BY LINDER AND PSS
Under this assignment of error Linder makes two arguments:
1.) That the first jury charge listed below was ambiguous and incomplete.
2.) That the second jury charge listed below was improper.
*843 The first charge complained of is as follows:
"Ordinarily a contractor is not liable for offenses of an independent contractor committed in the course of performing his duties under contract. An important exception to this rule is that if the work is inherently or intrinsically dangerous unless proper precautions are taken to avoid liability by letting the work to an independent."
In drafting the above jury charge, the court apparently relied on Thompson v. Petrounited Terminals, Inc. supra p. 839. Linder submits that the jury charge extracted from Thompson was incomplete and inappropriate.
In Thompson, the court held
"The evidence clearly establishes that cleaning a tank containing a highly explosive chemical is inherently dangerous. The expert testimony revealed that toluene is a highly explosive chemical as well as an asphyxiant and intoxicant, which can cause severe or fatal injuries when inhaled. These propensities combined with the slightest human error or misjudgment culminate in disaster. Thompson at 513 (emphasis added)."
Linder argues that the jury should have been provided with the criteria to be used in determining the legal definition of inherently or intrinsically dangerous. We find no merit in this argument. The trial court had previously ruled that Linder was absolutely liable because Linder, through its sub-contractor, was engaged in an ultrahazardous activity. We have previously affirmed that holding in this opinion.
Additionally we have examined the jury charge in the light of Thompson v. Petrounited Terminals, Inc. After examining Thompson in its entirety, together with the other cases cited in brief and applying the jurisprudence to this case, we cannot say that the jury charge was either ambiguous or incomplete.
Linder next argues that jury's request for clarification and the judge's response thereto prove the ambiguity. The jury foreman requested clarification on what constituted "proper precautions" and who was required to take those precautions was both satisfactory and proper. The trial court's response as to who was required to take those precautions was proper though somewhat incomplete if, as Linder argues, the law requires that the injured party be "doing his best." However, Linder failed to object to the clarification at the time it was given. This failure constituted a waiver of any defect in the judge's clarification.
The second jury charge complained of is as follows: "A workman whose duties require that he work in a hazardous environment, injured while discharging his duties, is not guilty of negligence, even though he was fully aware of the risk of injury to which he was subjected while performing his work."
Linder then cites the following: "[A] workman whose duties require he work in hazardous circumstances who is injured while doing his best to discharge those duties is not guilty of contributory negligence. Thompson at 511 (emphasis added)."
Based on the above. Linder alleges that: "Each time this issue has been considered by court, that court has required that the injured party be "doing his best" in order to preclude a finding of contributory negligence. O'Keefe v. Warner, 288 So.2d 911 (La.App. 1st Cir.1973), writ denied, 293 So.2d 170 (La.1974); Marzula v. White, 488 So.2d 1092 (La.App.2d Cir.1986)".
Linder's argument that the trial court was required to include therein a statement that the injured party was "doing his best" is not supported by either the O'Keefe case where the injured party was operating a crane, or the Marzula case where the injured party was measuring the bottom of an excavation because the employers in those cases were not engaged in an ultrahazardous activity. Additionally, we note that in Marzula, the court stated:
"A workman whose duties require that he work in hazardous circumstances who is injured while doing his best to discharge those duties is not guilty of contributory negligence even though he is *844 subjected while performing his work. O'Keefe v. Warner, 288 So.2d 911 (La. App. 1st Cir.1973), writ denied, 293 So.2d 170 (La.1974); Blakeney v. Tidewaters Compression Service, supra [463 So.2d 914 (La.App. 4th Cir.1976)]; Price v. Mitchell Const. Co., Inc., supra [482 So.2d 869 (La.App. 2d Cir.1986)]" 488 So.2d at 1098.
The doing "his best" in Marzula refers to is the completion of the assigned task, not a checklist of safety precautions. Assignment of error no. 7 is without merit.

ASSIGNMENT OF ERROR NO. 8 RAISED BY LINDER AND PSS
Linder assigns as error that the damages awarded by the jury were excessive[4]. In its brief Linder assigns as error the following awards:
1.) an award to June Ledet Bergeron, wife of Clark Bergeron, and the four Bergeron children for mental pain, suffering and distress;
2.) a total award of $525,000.00 to June Ledet Bergeron and the four Bergeron children for loss of consortium;
3.) the award of $150,000.00 to June Ledet Bergeron for the loss of services of her husband;
4.) a total award of $1,500,000.00 to Ronald Smith for past and future physical pain and suffering, past and future mental anguish and permanent disability and disfigurement;
5.) the total award of $700,000.00 to Mary Guidry Smith, wife of Ronald *845 Smith, and the two Smith children for loss of consortium;
6.) the total award of $3,750,000.00 to James Mark LeBlanc for past and future pain and suffering, past and future mental anguish and permanent disability and disfigurement;
7.) the award of $1,000,000.00 to James Mark LeBlanc for future medical expenses;
8.) the award of $480,000.00 to James Mark LeBlanc for future earning capacity; and
9.) the award of $645,000.00 to Kim LeBlanc, wife of James Mark LeBlanc, for loss of consortium.
As a result of the premature explosion of the perforating gun on August 27, 1987, two men of the Perfco crew were severely injured and one crew member died. Clark Bergeron died instantly as a result of the accident. Ronald E. Smith and James Mark LeBlanc sustained severe injuries.
Linder first contends that the jury improperly awarded damages to June Ledet Bergeron and the four children for mental pain and anguish. In its brief, Linder seems confused as to whose mental pain and anguish June Ledet Bergeron and the four children suffered as a result of the death of Clark Bergeron.
The elements of damage for wrongful death are loss of love and affection, loss of services, loss of support, medical expenses and funeral expenses. Pierre v. Lallie Kemp Charity Hospital, 515 So.2d 614, 617 (La.App. 1st Cir.1987), writ denied, 515 So.2d 1111 (La.1987). Additionally, the courts have allowed the award to plaintiffs in wrongful death actions damages for their mental pain, suffering and distress resulting from the death. See Duvernay v. State Department of Public Safety, Division of State Police, 433 So.2d 254, 262 (La.App. 1st Cir.1983), writ denied, 440 So.2d 150 (La.1983); Levet v. Calais & Sons Inc., 514 So.2d 153, 157 (La.App. 5th Cir.1987). Since the award of damages to June Ledet Bergeron and the four children for mental pain and anguish was proper, we find no merit to this argument.
Linder further argues that the award given by the jury to Mrs. Bergeron for loss of society is excessive and that the award given to Mrs. Bergeron for loss of services is improper because no evidence of his services and/or value of such services was presented at trial. The value of household services is simply a factor to be considered in awarding general damages for the loss of a spouse. Brooks v. City of Baton Rouge, Parish of East Baton Rouge, 558 So.2d 1177, 1182 (La.App. 1st Cir.1990), writ denied, 566 So.2d 982 (La. 1990). Likewise, the loss of society is simply a factor to be considered in awarding general damages in wrongful death action. Mrs. Bergeron was awarded: $350,000.00 for loss of society; and $150,000.00 for loss of services. Since both loss of society and loss of services are elements of the general damages due a plaintiff in a wrongful death action, we elect not to review these elements separately when reviewing the award given for each of them.[5]
The total general damages awarded by the jury to Mrs. Bergeron for the elements of loss of society and loss of services is $500,000.00. We have reviewed the particular facts of this case and have determined that the jury abused its discretion in awarding damages for loss of society and services.
[A] quantum award is reviewed on appeal by the "much discretion" standard. If an abuse of discretion is found, the appellate court will only lower the award to the highest (or raise the award to the lowest) point which is reasonably within the discretion afforded the court; the appellate court does not substitute its judgment for that of the trial court judge *846 or jury in this situation. (citations omitted) Bridevaux v. Marchand, 543 So.2d 930, 933 (La.App. 1st Cir.1989).
Since the jury verdict is broken down into three elements for general damages of wrongful death action and only two have been questioned as to quantum, we must take the undisputed element into consideration when looking at the prior awards. A review of the general damage awards given for the loss of spouse in wrongful death actions reveals that general damage for loss of a spouse range between $200,000.00 and $300,000.00. See Brooks v. City of Baton Rouge, Parish of East Baton Rouge, 558 So.2d at 1182; Taking into consideration the award of $900,000.00 awarded Mrs. Bergeron for mental pain and anguish, we find that Mrs. Bergeron merits only nominal awards of $5,000.00 for loss of services and $5,000.00 for loss of society.
Linder also argues that the damages awarded to the Bergeron children for loss of society are excessive. The jury made the following awards for loss of society: Cale Bergeron, $75,000.00; Clark Bergeron Jr., $25,000.00; Bonnie Brien, $25,000.00; and Travis Bergeron, $50,000.00. With the award of damages to each child for mental pain and anguish having been taken into consideration, we find no abuse of discretion by the jury in its awards for loss of society.
Linder next contends that the following awards to Ronald E. Smith were excessive: $500,000.00 for past and future physical pain and suffering; $500,000.00 for past and future mental anguish; and $500,000.00 for permanent disability and disfigurement. Before a jury award for damages can be questioned as inadequate, the reviewing court must look first, not to prior awards, but to the individual circumstances of the case. A damage award should not be disturbed by a reviewing court absent a showing of a clear abuse of discretion vested in the jury. (citations omitted) Holliday v. United Services Automobile Association, 569 So.2d 143, 145 (La. App. 1st Cir.1989).
The record reveals that Mr. Smith sustained severe injuries. As a result of the explosion, Mr. Smith lost his right leg below the knee and part of his little finger on his left hand. Mr. Smith also lost a large amount of soft tissue, bone, tendon and ligament from his left foot and had shrapnel lodged in his right eye. Additionally, the explosion caused Mr. Smith to suffer multiple shrapnel wounds to the front of his body and face. As a result of the accident, Mr. Smith spent forty-nine days in the hospital and underwent nine surgical operations. Mr. Smith's permanent disabilities are as follows: ninety percent disability for his right leg which translates into a thirty-six percent disability of his whole body; ten percent disability for the left foot; ten percent disability of the left hand; and legal blindness in his right eye. Mr. Smith has been fitted for prosthesis for his leg but because of the ulcers on his stump, Mr. Smith often has to use a wheelchair. After looking at the particular circumstances of this case, we cannot say that the jury abused its discretion in making the awards of mental anguish, pain and suffering, and permanent disability and disfigurement.
Linder contends that the awards to Mrs. Smith and the two minor Smith children for loss of consortium were excessive. The jury made the following awards for loss of consortium: Mrs. Smith, $500,000.00; Sandra Gail Smith, $100,000.00; and Ronald Smith Jr., $100,000.00.
The compensable elements of damage in loss of consortium are loss of society, sex, service and support. `Society' is broader than the loss of sexual relations. It includes general love, companionship, and affection that the spouse loses as a result of the injury. `Support' is the lost family income that would go to support the uninjured spouse. `Service' is the compensated work around the house or educational help with the children which presumably will, as a result of the injury, have to be obtained from another source and at a price. (citations omitted) Lonthier v. Northwest Ins. Co., 497 So.2d 774, 776 (La.App.3rd Cir.1986).
*847 We have reviewed the particular facts and circumstances of this case and find the jury has abused its discretion in making its award. Mr. Smith was in the hospital for forty-nine days and has suffered severe permanent injuries as a result of the explosion. With regard to Mrs. Smith, we find the highest award that the jury could have awarded her is $100,000.00. Although our review of the awards given for loss of consortium for a spouse reveals that our award is the highest award ever[6], we believe the facts of this case warrant this award.
Additional we have reviewed the particular facts of this case and find that the jury abused its discretion in its award of loss of consortium to the two children, Sandra and Ronnie Jr. We find that the award of $100,000.00 to each minor child is excessive. Further, we find that the highest award that the jury could have awarded the minor children is $35,000.00 each.
Linder further contends that the amounts awarded to James Mark Leblanc for his physical pain and suffering, mental anguish and permanent disability and disfigurements are excessive. The jury awarded James Mark LeBlanc $1,250,000.00 for each of the above categories of damages for a total of $3,750,000.00.
The force of the explosion severed part of Mr. LeBlanc's left arm, his entire left hand and entire left leg below the knee. Mr. LeBlanc also sustained a loss of a substantial portion of his right quadricep and its surrounding tissue. The explosion also caused multiple shrapnel wounds to the entire body and multiple severe lacerations including ones to his lower right leg, right foot and right hand. Mr. LeBlanc's body sustained multiple fractures including right tibia, right great toe, right ring finger and right little finger. Mr. LeBlanc's eyes were filled with shrapnel as a result of the explosion. Mr. LeBlanc never lost consciousness until his arrival at the Terrebonne General Hospital and was aware of the severity of his injuries. Mr. LeBlanc underwent eight separate procedures which required general anesthesia.
Because of the fractures to Mr. LeBlanc's right leg, pins were placed through his leg with an external fixator to maintain the stability of the fractures. The pins were left in his leg for over five months. The functional use of Mr. LeBlanc's right leg and right foot has been greatly reduced because of accident. Mr. LeBlanc will probably need further surgeries in the quadricep region and in the ankle region to give him more flexibility.
During a surgical procedure, sixty-nine pieces of metal were removed from Mr. LeBlanc's left eye and twenty pieces of metal were removed from Mr. LeBlanc's right eye. As a result of the metal fragments, Mr. LeBlanc has suffered scarring in his left cornea which have left him unable to wear the hard contact lens which are necessary to correct his vision loss. Dr. Steigner testified that due to the reduced vision in the left eye Mr. LeBlanc uses that eye only for peripheral vision and as a result relies on the right eye for primary vision. Additionally, the record contains evidence that it is a good possibility that Mr. LeBlanc will need eye surgery in the future. After reviewing the record and the severity of Mark LeBlanc's injuries, we cannot say that the jury abused its discretion in making the awards.
Linder next contends that the $1,000,000.00 in future medical expenses awarded to Mr. LeBlanc is excessive and unsupported by the facts. Linder bases its contention on what it feels are basic flaws in the life care plan prepared and submitted by Nathaniel Fentress, a vocational rehabilitation expert, and Dr. Randolph Rice, an economist. The life care plan contained high figures and low figures for various treatments, medical aids, operations, etc. The life care plan had both a high cost and a low cost for the total anticipated future medical expenses. The low figure was $952,667.00 and the high figure was *848 $1,404,482.00. Linder does not dispute the whole plan but only particular expenses which had high figures that totaled roughly $487,000.00. Taking into consideration the high figure for the health plan and looking at the amount awarded, we cannot say that the jury did not take into account the expenses complained of by Linder when it made its award for future medical expenses. Therefore, we find no merit to this argument.
Linder next contends that $480,000.00 awarded to Mr. LeBlanc for loss of future earning capacity was excessive. Awards for loss of future income are inherently speculative and insusceptible of being calculated with mathematical certainty. The court must exercise sound judicial discretion in reviewing these awards and render a decision which is consistent with the record and does not work an injustice on either party. The standard to be applied requires damages for loss of earnings to be based on the injured person's ability to earn money rather than what he actually earned prior to the injury. (citations omitted) Wisner v. Illinois Cen. Gulf R.R. (La. App. 1st Cir.), 537 So.2d 740, writ denied, 540 So.2d 342 (La.1989).
Nathaniel Fentress took a survey in the Houma area and determined that the average annual earning for a slickline wireline operator was $30,000.00 a year. Additionally, we note that in 1981 and 1982 Mr. LeBlanc earned over $34,000.00 a year. Linder argues solely that the figure of $30,000.00 should not be used to calculate the loss of earnings for Mr. LeBlanc because his average salary over the last ten years is $18,000.00. As stated above, loss of earnings are based on a person's ability to earn rather what he actually earned prior to the injury. Therefore, we find no merit to this argument.
Lastly Linder contends that the jury abused its discretion in awarding Kim LeBlanc $645,000.00 in damages for loss of consortium. We have reviewed the particular facts of this case and find that the jury abused its discretion in its award of damages to Kim LeBlanc for loss of consortium. For the reasons stated in our treatment of loss of consortium to Mrs. Smith, we reduce the award to $100,000.00.

ASSIGNMENT OF ERROR NO. 2 RAISED BY PSS
PSS contends that the judgment rendered by the trial judge violates PSS's constitutional guarantee of equal protection because a tortfeasor is solidarily liable for 100% of a plaintiff's damages without any right of contribution, credit or offset in consequence of the concurrent fault of plaintiff's employer.[7] In Johnson v. Welsh, 334 So.2d 395, 396 (La.1976), the court stated:
It is well settled that all laws presumed to be constitutional until the contrary is made to appear, and that as a general rule a litigant cannot raise the unconstitutionality of a statute unless its unconstitutionality is specially pleaded and the grounds particularized. As a corollary of this rule, a litigant who fails to plead the unconstitutionality of a statue in the trial court cannot raise the constitutional issue in the appellate court.
(citations omitted).
It is undisputed that PSS first raised their constitutional argument in a motion entitled "Supplemental Ground for New Trial." The constitutional issue was never argued, briefed or raised during the trial. PSS contends that allegations of unconstitutionality raised for the first time in a motion for new trial is sufficient for a court of appeal to consider same. In Jarred v. Jarred, 355 So.2d 566, 569 (La. App.3rd Cir.1978), the court held that when the issue of the constitutionality of a statute is first raised in a motion for new trial after a judgment adverse to the moving *849 party, it does not consider the issue timely raised and cannot be considered by the appellate court.[8] See also Adoption of Latiolais, 376 So.2d 555, 561 (La.App.3rd Cir. 1979) "affirmed", 384 So.2d 377 (La.1980). We agree with our brethren in the Third Circuit. Therefore, we find that the constitutional issue has not been properly raised.

ASSIGNMENTS OF ERROR RAISED BY PLAINTIFFS

Plaintiffs make two assignments of error as follows:
1. The trial court erred in denying the plaintiff's motion for judgment not withstanding the verdict that Bittle was an employee of Linder.
The criteria to be applied by the trial court in considering a JNOV is set out in Blum v. New Orleans Public Services, Inc., 469 So.2d 1117, 1119 (La.App.4th Cir.1985), writ denied, 472 So.2d 921 (La.1985).
In ruling on a motion for a judgment notwithstanding the verdict, pursuant to LSA-C.C.P. Art. 1810.1 (now substantially reenacted in LSA-C.C.P. Art. 1811), the trial judge considers all of the evidence and reasonable inferences in a light most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable persons could not arrive at a contrary verdict, the motion should be granted and the trial judge should render a judgment notwithstanding the jury's findings. On the other hand, if there is substantial evidence of such quality and weight that reasonable and fair minded persons in the exercise of impartial judgment might reach different conclusions, the motion for judgment N.O.V. should be denied. In applying this standard, the court does not weigh the evidence, pass on the credibility of the witnesses, or substitute its factual judgment for the jury's.
Applying the above law to this case, we cannot say that the trial judge was manifestly erroneous in ruling against Plaintiff's motion for a JNOV holding that Linder was the employer of Bittle because the evidence, viewed in the light most favorable to Linder would tend to show that Bittle was not the employee of Linder. This assignment is without merit.
2. The plaintiffs contend the trial judge erred in directing a verdict for DuPont, the manufacturer of the blasting cap.
As stated in Assignments of Error No. 5, the standard of review for directed verdicts is whether, viewing the evidence submitted, the appellate court concludes reasonable people could not reach a contrary verdict. We find nothing in the record to support plaintiffs position. Plaintiffs rely on circumstantial evidence. However, a party relying on circumstantial evidence must prove that the evidence, taken as a whole, shows that the defendant's is the most plausible cause of the damage and no other factors can reasonably be ascribed to the cause. See Anglin v. White, 572 So.2d 779 (La.App.4th Cir.1990). Plaintiffs have not carried that burden of proof.
For the above and foregoing reasons the judgment of the trial court is amended as follows:
A. The award to Mrs. June Ledet Bergeron for loss of services is reduced from $150,000.00 to $5,000.00
B. The award to Mrs. June Ledet Bergeron for loss of society is reduced from $350,000.00 to $5,000.00
C. The award to Mrs. Mary Smith for loss of consortium is reduced from $500,000.00 to $100,000.00
D. The award to Sandra Gail Smith for loss of consortium is reduced from $100,000.00 to $35,000.00
E. The award to Ronald Smith, Jr. for loss of consortium is reduced from $100,000.00 to $35,000.00
F. The award to Mrs. Kim LeBlanc for loss of consortium is reduced from $645,000.00 to $100,000.00
*850 In all other respects the judgment of the trial court is affirmed.
AMENDED IN PART AND AS AMENDED AFFIRMED.
LeBLANC, J., concurs in part, dissents in part and assigns reasons.
LeBLANC, J., dissenting.
I respectfully dissent in part from the opinion of the court. This dissent is limited to the court's conclusion that the admission of certain enlarged color photographs (LeBlanc exhibits 4, 5, 6, 7, and 8) depicting Mark LeBlanc's injuries was not erroneous. The writing judge acknowledged that these photographs were prejudicial, but apparently concluded that their probative value outweighed their prejudicial effect. I disagree, believing that the probative value these photographs may have possessed for the purpose of showing the injuries Mr. LeBlanc suffered was substantially outweighed by the prejudicial effect these graphic and extremely bloody photographs might have had in inflaming and influencing the jury. See, La.C.E. art. 403; Malbrough v. Wallace, 594 So.2d 428 (La.App. 1st Cir.1991)[1], writ denied, 596 So.2d 196 (1992). Due to the prejudicial nature of these photographs, I believe they tainted the jury's award of damages to Mr. and Mrs. LeBlanc so that these awards were not entitled to be given any weight by this court on appeal. See, Malbrough, supra. Thus, this court should have conducted a de novo review of the record, disregarding the prejudicial photographs, to determine the amount of damages to which Mr. and Mrs. LeBlanc were entitled and rendered judgment accordingly.
Defendants-appellants also contend that a video depicting medical treatment received by Leblanc was erroneously admitted into evidence. Since this video is absent from the record on appeal, we are unable to review it to determine whether the trial court erred in admitting it. Therefore, the trial court's ruling is presumed to be correct in the absence of a showing in the record to the contrary. Werner Enterprises v. Westend Dev. Co., 563 So.2d 540 (La.App.5th Cir.1990).
For these reasons, I dissent from that part of the opinion which finds that the trial court properly admitted the photographs designated above. I concur in the result reached in all other respects.
NOTES
[1] Additional defendants were manufacturers associated with the perforation equipment and wireline units: Jet Research Center, Inc., Ensign-Bickford Company, and D & W International, Inc. These defendants were dismissed before the trial concluded.

Also named as defendants were manufacturers of casing collar locators, Gearhart Industries, Inc., and Goex, Inc.
[2] The Court cited two cases to compare: Molett v. Penrod Drilling Co., 826 F.2d 1419 (5th Cir. 1987) and Molett v. Penrod Drilling Co., 872 F.2d 1221 (5th Cir.1989).
[3] The plaintiff in their have cited the case of Fontenot v. Magnolia Petroleum Co., 227 La. 866, 80 So.2d 845 (1955) to support the trial court's directed verdict that Linder is absolutely liable because they were engaged in blasting. In Fontenot, the court held that a defendant who blast with explosives is absolutely liable for the damages caused by the explosion. We acknowledge that the facts of Fontenot and the case sub judice are distinguishable, however, we do not base our findings of absolute liability solely on Fontenot.
[4] The jury verdict included the following awards:

A. June Ledet Bergeron
 1. Loss of services ............ $ 150,000.00
 2. Loss of support ............. $ 115,000.00
 3. Loss of society ............. $ 350,000.00
 4. Mental pain, suffering
 and distress .............. $ 900,000.00
TOTAL.............................. $ 1,515,000.00
B. Cale Bergeron
 1. Loss of support ............. $ 50,000.00
 2. Loss of society ............. $ 75,000.00
 3. Mental pain, suffering
 and distress .............. $ 75,000.00
TOTAL.............................. $ 200,000.00
C. Clark Bergeron, Jr.
 1. Loss of support ............. $ 0
 2. Loss of society ............. $ 25,000.00
 3. Mental pain, suffering
 and distress .............. $ 75,000.00
TOTAL .............................. $ 100,000.00
D. Bonnie Brien
 1. Loss of support ............. $ 0
 2. Loss of society ............. $ 25,000.00
 3. Mental pain, suffering
 and distress .............. $ 75,000.00
TOTAL.............................. $ 100,000.00
E. Travis Bergeron
 1. Loss of support ............. $ 25,000.00
 2. Loss of society ............. $ 50,000.00
 3. Mental pain, suffering
 and distress .............. $ 75,000.00
TOTAL.............................. $ 150,000.00
F. James Mark LeBlanc
 1. Physical pain and suffering,
 both past and future....... $ 1,250,000.00
 2. Mental anguish, both
 past and future ........... $ 1,250,000.00
 3. Future medical expenses ..... $ 1,000,000.00
 4. Permanent disability and
 disfigurement ............. $ 1,250,000.00
 5. Loss of past wages .......... $ 38,000.00
 6. Loss of future earning
 capacity .................. $ 480,000.00
TOTAL.............................. $5,268,000.00
G. Kim LeBlanc
 1. Loss of consortium .......... $ 645,000.00
TOTAL.............................. $ 645,000.00
H. Ronald E. Smith
 1. Physical pain and suffering,
 both past and future....... $ 500,000.00
 2. Mental anguish, both
 past and future ........... $ 500,000.00
 3. Future medical expenses ..... $ 100,000.00
 4. Permanent disability and
 disfigurement ............. $ 500,000.00
 5. Loss of past wages .......... $ 50,000.00
 6. Loss of future earning
 capacity .................. $ 400,000.00
TOTAL.............................. $2,050,000.00
I. Mary Guidry Smith
 1. Loss of consortium ........... $ 500,000.00
TOTAL................................ $ 500,000.00
J. Sandra Gail Smith
 1. Loss of consortium ............ $ 100,000.00
TOTAL................................ $ 100,000.00
K. Ronald Edward Smith, Jr.
 1. Loss of consortium ............ $ 100,000.00
TOTAL................................ $ 100,000.00

[5] We note at this time that our court has viewed mental pain and anguish as an element of the general damages in wrongful death claim. See Duvernay v. State Department of Public Safety, Division of State Police, 433 So.2d at 262. We also note that we have not treated the element of pain and anguish together with loss of society and loss of services because Linder argued only that this court did not recognize mental pain and anguish as an element of general damages for wrongful death and did not dispute the quantum.
[6] See Tracy v. Parish through Department of Public Works, 523 So.2d 266 (La.App. 5th Cir. 1988) writ denied 530 So.2d 569, where the court affirmed and awarded of $75,000.00 to a spouse for loss of consortium.
[7] The accident occurred on August 28, 1987. The effective date of the amendment to LSA-C.C. Art. 2324 whose title provides "Liability as Solidary or Joint and Divisible Obligation" was September 1, 1987. Act 1987 No. 373 § 1 amended LSA-C.C. Art. 2324 to provide in pertinent:... liability for damages caused by two or more persons shall be solidary only to the extent necessary for the person suffering injury, death, or loss to recovery fifty percent of his recoverable damages....
[8] We note that none of the exceptions expressed in Summerall v. Phillips, 258 La. 587, 247 So.2d 542, 546 (1971), for raising a constitutional issue on appeal which has not been raised in the trial court are present in this case.
[1] Docket number 90 CA 1109; rendered December 27, 1991.