663 So.2d 497 (1995)
Truman and Bessie OXLEY, Plaintiffs-Appellants-Appellees,
v.
SABINE RIVER AUTHORITY, et al., Defendants-Appellants-Appellees.
No. 94-1284.
Court of Appeal of Louisiana, Third Circuit.
October 19, 1995.
Rehearing Denied December 14, 1995.
*500 Steven D. Crews, Robert Raymond Arthur, Natchitoches, for Truman and Bessie Oxley.
John W. Perry Jr., Baton Rouge, Brian David Smith, Shreveport, Joseph B. Stamey, Natchitoches, for J.D. Electric Co. & Aetna.
Lee H. Ayres, Herschel Richard, Shreveport, for Homer Byers & Aetna Casualty & Surety Co.
Before LABORDE[*], COOKS and WOODARD, JJ.
COOKS, Judge.
Sabine River Authority (SRA), the state agency in charge of overseeing Toledo Bend, owns and operates Park Site 11 located in Sabine Parish. The park site contains a water purification system that provides fresh water to the park and other areas of Toledo Bend. A citizens group formed Ebarb Water Works District for the express purpose of securing fresh water for use by outlying rural residents. Ebarb approached SRA proposing to upgrade and expand the water treatment facility at Park Site 11 in exchange for fresh water rights for its membership. SRA and Ebarb executed a lease granting Ebarb full use and access to the water treatment facility. In furtherance of this agreement, Ebarb retained the services of Homer Byers, as general contractor, to begin renovations at the water site. The construction project required certain electrical work which Byers subcontracted to J.D. Electric Company. S.M. Cothren & Associates, an engineering firm, prepared the plans and specifications for the job; and, Homer Pyrtle & Associates prepared the electrical plans and specifications. Ebarb also retained Utility Data Service (UDS) as its managing agent for the project.
*501 At the start of construction, the engineers discovered, if the facility was upgraded and expanded as planned, the voltage demanded would exceed the capacity of the existing transformer. On June 20, 1990, the engineers requested a bid from Byers for removal of the existing 50 KVA transformer and its replacement with a 100 KVA transformer. In turn, Byers contacted J.D. Electric (the subcontractor) to obtain a price quote for the job. Byers' proposal to complete this additional work was forwarded to UDS; but, it was rejected. Instead Jeff Pruett, a UDS employee, purchased a transformer from Arkansas Transformer Sales. Arkansas Transformer purchased the transformer from B & B Transformer, the manufacturer. On December 8, 1990, the transformer was installed by UDS. George Strickland, representing CLECO (the local utility company), "gave the go ahead" to energize the new transformer. Shortly thereafter, the project's engineers notified Byers that the newly installed transformer presented several "safety concerns" which exposed handlers or workers to electrical voltage hazards. Byers related this message to J.D. Electric. A few days later Pruett and Byers requested that J.D. Electric disconnect the low voltage lines attached to the transformer by UDS on December 8 and install new wiring. J.D. Electric did the rewiring work in the presence of Byers' and UDS' representatives.
In April 1991, Jeff Pruett contacted Truman Oxley, a retired electrical worker, to solicit an opinion from him regarding why a meter servicing the new transformer was not operating properly. After inspection, Oxley informed Pruett he did not know why the meter was malfunctioning and suggested that he contact an electrician. On May 8, 1991 two UDS workers arrived at Oxley's home and requested that he inspect the meter a second time. Oxley agreed. Oxley, standing near the transformer, was severely injured when electricity arced from the transformer striking him.

PROCEDURAL HISTORY
Truman Oxley and his wife Bessie filed suit against various parties, including SRA, UDS, CLECO, Arkansas Transformer, B & B Transformer, Homer Byers, J.D. Electric and various insurance companies. Prior to trial, Arkansas Transformer and B & B Transformer answered discovery and filed pleadings alleging the absence of insurance to cover their potential exposure; and further stating they lacked sufficient funds to pay counsel of record. They were unrepresented at trial.
On the morning of trial, plaintiffs recited (for the record) that a settlement with CLECO, UDS, SRA, and certain insurers for payment of $1,562,400.00 had been entered. After lengthy trial, the jury returned a verdict apportioning fault between the released and remaining parties as follows:

B & B Transformer 25%
Utility Data Service, (UDS) 25%
Central Louisiana Electric Co.
 (CLECO) 25%
Sabine River Authority (SRA) 10%
Arkansas Transformer Sales 10%
J.D. Electric Company 5%
Homer Byers 0%
Truman Oxley 0%

The jury awarded Truman Oxley $2,200,000.00 in general damages and $875,000.00 for past and future medical care. They also awarded Bessie Oxley $500,000.00 for loss of consortium and household services. The trial judge then rendered judgment against J.D. Electric Company, Arkansas Transformer and B & B Transformer, in solido, for 40% of the damages awarded by the jury.
J.D. Electric and Aetna appealed the jury's verdict alleging the following assignments of error:
1. The jury erred in assigning fault to J.D. Electric.
2. Alternatively, the jury erred in failing to assign fault to Truman Oxley in an amount greater than the amount assigned to J.D. Electric.
3. The trial court erred in failing to reapportion fault of the insolvent solidary obligors in a manner consistent with the Louisiana Civil Code.
4. The jury abused its discretion in awarding excessive damages.
5. The trial court erred in its assignment of costs to J.D. Electric.
*502 Plaintiffs also appealed the jury's verdict assigning for review the following alleged errors:
1. The jury erred in not finding Homer Byers legally responsible for the damages sustained by the Oxleys.
2. The jury erred in the amount of fault apportioned to J.D. Electric.
3. The jury erred in finding the Sabine River Authority at fault and in awarding ten (10) percent of the fault to Arkansas Transformer.
4. The jury erred in failing to award the entire amount of future medical care determined by the uncontradicted expert testimony.
5. The jury erred in awarding insufficient damages for past, present and future physical and mental pain and suffering.

THE STANDARD OF APPELLATE REVIEW
The standard of review which we must apply in examining the factual conclusions of a trier of fact was articulated by our Supreme Court in Rosell v. ESCO, 549 So.2d 840 (La.1989), and recently reiterated in Stobart v. State, Through Department of Transportation and Development, 617 So.2d 880 (La.1993):
A court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong." Rosell v. ESCO, 549 So.2d 840 (La.1989). This court has announced a two part test for the reversal of a factfinder's determinations:
1) The appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and
2) the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous).
... [T]he issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one.
. . . . .
Even though an appellate court may feel its own evaluations and inferences are more reasonable than the factfinder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. Rosell v. ESCO, 549 So.2d 840 (La.1989); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). However, where documents or objective evidence so contradict the witnesses' story, the court of appeal may find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. Rosell, 549 So.2d at 844-45. Nonetheless, this Court has emphasized that "the reviewing court must always keep in mind that `if the trial court or jury's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.'" Housley v. Cerise, 579 So.2d 973 (La.1991) (quoting Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106, 1112 (La.1990)).
We have examined the record in light of these principles.

APPORTIONMENT OF FAULT
J.D. Electric asserts the jury erred in finding it five (5) percent at fault and Truman Oxley free from fault in causing the accident. Plaintiffs also assign error attacking the jury's fault assessments. They contend the jury erred in failing to find Homer Byers at fault, not apportioning more fault to J.D. Electric, apportioning ten (10) percent fault to Arkansas Transformer, and apportioning fault to Sabine River Authority.

1. Fault of Truman Oxley
First, J.D. Electric urges the jury erred in finding Truman Oxley free from fault. They argue Oxley visited the transformer twice, and he admitted knowing "something was wrong with the transformer." He also was aware, J.D. Electric asserts, that this was a live-front transformer, *503 which is more dangerous than a dead-front transformer.[1]
J.D. Electric claims, thus, Oxley was negligent in not de-energizing the transformer before working on it. Responding, Oxley testified at trial the test he was requested to perform required that the transformer remain energized which was necessary to determine whether the voltage was reaching the meter. Further, Oxley testified de-energizing the transformer was unnecessary unless he intended to work on it. Oxley's testimony was corroborated by Johnnie Derrick and Edgar Moore, the owners of J.D. Electric, who were both at the job site when the accident occurred. Moore testified at trial he actually opened the transformer while energized and looked inside of it to determine necessary connections. He denied this maneuver exposed him to greater danger noting he was experienced and knew the procedures to follow when opening the transformer. Truman Oxley's experience exceeded that of Edgar Moore. Oxley worked with high voltage for approximately 40 years. Further, at the time of injury, Oxley was standing near the transformer. He did not touch or open it.
J.D. Electric asserts Oxley was standing too close to the transformer. Ray Malmay, who witnessed the accident, testified Oxley was standing between eighteen inches and two feet from the transformer. George Strickland, an experienced CLECO employee, testified he too would have stood within eighteen inches of the transformer with it energized because his experience taught such distance was safe. Likewise, Malmay testified Oxley was standing a safe distance from the transformer at the time of the accident. Edgar Moore testified he was advised later that Oxley was standing at least two feet away from the transformer when the accident occurred. Johnnie Derrick also confirmed the distance Oxley was standing ordinarily would not place him in danger even if the transformer remained energized.
In support of its argument, J.D. Electric calls this court's attention to Dobson v. Louisiana Power & Light Co., 567 So.2d 569 (La.1990). In Dobson, a tree trimmer was electrocuted when his metallically reinforced safety rope contacted an uninsulated 8,000 volt electric power distribution line. The trial court found the plaintiff free from fault and awarded damages. The appeals court affirmed the award of damages, but reversed the apportionment of liability assigning plaintiff seventy (70) percent fault. While reducing plaintiff's fault to forty (40) percent, the Supreme Court concluded "Dobson's conduct in lowering himself down the tree trunk with a metallically reinforced safety line dangling below near the electric wires substantially increased the possibility of such an accident." Dobson is factually distinguishable from the present.
When two permissible views of the evidence exist, the jury's choice between them cannot be manifestly erroneous. Stobart v. State, Through Department of Transportation and Development, 617 So.2d 880 (La.1993). The jury obviously found more credible Oxley's testimony that he was standing a safe distance from the transformer; and, this testimony was well corroborated at trial. Unlike Dobson, the jury concluded standing eighteen inches to two feet from the energized transformer was not negligent conduct requiring it to assess a percentage of fault to Oxley. The jury's factual finding is reasonably supported by the record evidence; and, its verdict finding Oxley free from fault is legally sound.

2. Fault of J.D. Electric
J.D. Electric further contends the jury erred in finding it five (5) percent at fault. Plaintiffs argue J.D. Electric should have been assessed a greater percentage of fault. As J.D. Electric points out, it performed work on the transformer only once. On December 11, 1990, J.D. Electric removed wiring from the low voltage side of the transformer and replaced it with new wiring. J.D. Electric also maintains it "faithfully followed all oral instructions that day" *504 from Homer Byers and the engineers on the project.
Apparently, the jury found J.D. Electric negligent because the low-voltage and high-voltage wiring were enclosed in the same compartment. The National Electric Code, the National Safety Electric Code and the applicable ANSI standards warn that low and high voltage wires should not occupy the same compartment. The aim of this safety requirement was to allow access to the low-voltage area without exposing a worker to dangerous high-voltage bushings unnecessarily. Johnnie Derrick testified he was aware the National Electric Code warns against enclosing both low and high voltage wiring in the same compartment. Despite this admitted knowledge, J.D. Electric enclosed the low voltage and high voltage wiring in the same compartment. J.D. Electric also was aware of the inherent danger presented by a live-front transformer. When Johnnie Derrick called a manufacturer about a price on a live-front transformer, he was informed this particular type voltage transformer was dangerous and it was not manufactured in a configuration that would permit its sale to an individual or contractor. The manufacturer also revealed it only sold live-front transformers to utility companies.
Citing La.R.S. 9:2771, J.D. Electric nevertheless argues it should not have been assigned any fault because it was following the plans and specifications of Homer Byers. La.R.S. 9:2771 states:
No contractor shall be liable for destruction or deterioration of or defects in any work constructed, or under construction, by him if he constructed, or is constructing, the work according to plans or specifications furnished to him which he did not make or cause to be made and if the destruction, deterioration or defect was due to any fault or insufficiency of the plans or specifications.
Homer Byers insisted, however, that wiring the transformer did not form part of the work he contracted to perform. He denied furnishing J.D. Electric any plans or specifications relating to connecting the low voltage wiring.
The defense to liability provided by adoption of R.S. 9:2771 is not available to J.D. Electric. We also note a "contractor is not relieved of liability to third persons if he has a justifiable reason to believe that adherence to plans and specifications would create a hazardous condition." Nolan v. S & W Steel Fabricators, Inc., 600 So.2d 929 (La. App. 2 Cir.1992). Further, a contractor has a duty to exercise ordinary care and an obligation to third parties to refrain from creating hazardous conditions. Lafont v. Chevron, 593 So.2d 416 (La.App. 1 Cir.1991).
J.D. Electric points out it did not manufacture, sell, or install the transformer, and had only limited involvement with it. This undoubtedly is why the jury only cast J.D. Electric with five (5) percent fault rather than the greater percentages of fault assigned the manufacturer (B & B Transformer 25%), the installer (UDS25%) and the seller (Arkansas Transformer Sales10%). Plaintiffs' expert, William Adams, testified he could not positively pinpoint the exact cause of the accident, considering the inherent danger in a live-front transformer. However, he testified if the standards requiring separation of high voltage and low voltage wires were followed, the accident would have been "much less likely to occur." For the above reasons, we cannot say the jury was clearly wrong in finding J.D. Electric at fault in causing this accident. We also reject the plaintiffs' contention that J.D. Electric should have been assessed a greater percentage of fault.

3. Fault of Homer Byers
Plaintiffs contend the jury erred in failing to apportion any fault to Homer Byers, the general contractor on the project. They argue relevant portions of the contract placed all safety responsibility at the job site firmly on Homer Byers' shoulders. Plaintiffs cite the following provisions of the contract:
"11.1 The CONTRACTOR will be responsible for initiating, maintaining and supervising all safety precautions and programs in connection with the WORK. The CONTRACTOR will take all necessary precautions for the safety of, will provide the necessary precautions for the safety of, and will provide the necessary protection *505 to prevent damage, injury or loss to all employees on the WORK and other persons who may be affected thereby ..."
"11.3 In emergencies affecting the safety of persons or the WORK or property at the site or adjacent thereto, the CONTRACTOR, without special instructions or authorization from the ENGINEER or OWNER, shall act to prevent threatened damage, injury or loss ..."
"12.1 The CONTRACTOR will supervise and direct the WORK. He will be solely responsible for the means, methods, techniques, sequences and procedures of construction..."
Plaintiffs also note the contract required the contractor to hook up all owner supplied equipment which was furnished under the contact. In specific, it provided:
"3.09.1 This contractor shall bring all required electrical service to all equipment items furnished under other sections of these specifications or by the owner, make final connections, and leave equipment ready for operation."
Byers argued that hooking up the low-voltage side to the transformer was outside the scope of the "WORK," and that the 100 KVA transformer was not owner supplied equipment. Apparently the jury agreed with Byers' argument, finding him free from fault in causing the accident.
There were a number of witnesses who testified the transformer, its installation and its connections were not part of the contract. Johnnie Derrick, a co-owner of J.D. Electric testified as follows:
Q. What were youwere you later instructed by someone to make the low voltage connections on the transformer?
A. Yes, sir.
Q. And who instructed you to do that?
A. Mr. Byers.
Q. Did you consider that connection to be part of the contract?
A. No, sir, I did not.
Q. Did you inform Mr. Byers of that?
A. I did.
Q. You were asked about the job specifications, more specifically page 16010-6, which is section 3.09.1, let me ask you about this. If you would look at this section? (TENDERING DOCUMENT)
A. (EXAMINING DOCUMENT) Okay.
Q. Did that section of the specifications or contract require you to make the secondary connections to the transformer Mr. Pruett had provided?
A. If the transformer had not been a utility owned transformer. If the transformer had been furnished by us or if it had been an existing transformer of Ebarb Water System and been listed as such on the drawings, yes, we would have expected to terminate.
Q. It wasn't listed that way on the contract, was it?
A. It was listed on the contract drawings as belonging to Valley Electric.
Q. So according to the contract you didn't consider that to be owner supplied equipment that required you to make an installation or a connection?
A. Wait a minute, let me read this again. (READING SILENTLY) I'm sorry. I've gotten off on a tangent. This paragraph you're asking me is dealing with owner supplied equipment on the job.
Q. Right?
A. That paragraph there is very much pertinent to this contract. Also that paragraph is pertinent to the fact that, as Mr. Byers testified earlier, these drawings that we received are a part of the contract and they're what we bid on to do for the customer. Generally when owner supplied equipment such as mentioned here is encompassed and they let us know that that's going to be delivered to the job site prior to the bidding of the job. The owner supplied equipment is usually a separate listing within the specifications. As, for instance, if we were going to be wiring a restaurant and the owner was going to supply an electric stove and an electric dishwasher, there would be a listing of equipment that the owner was going to supply and that we would have to hook up. This does not tell us to hook up something that the owner has made no mention of nor *506 had no intention of furnishing prior to the contract time.
Stan Cothren, an engineer on the project, testified:
Q. Was there any determination made about that transformer as to whether it was suitable for the loads that would be used at that workat that job after the modifications were performed?
A. Mr. Harbin at some time during the course of when thethey were doing the electrical engineering work or during construction at some time, he advisedI believe he advised our firm, or Brad Graff with our firm, that that fifty (50) KVA transformer would not be adequate and that they needed to have a hundred (100) KVA transformer to operate the water plant.
Q. Now was the one hundred (100) KVA transformer part of the original plans and specifications that Homer Byers contracted to do?
A. No, sir, it was not.
Q. Would it be correct then that it was notthe hundred (100) KVA transformer was not part of the work as defined under the contract?
A. No, sir, it was not.
Homer Byers testified as follows:
A. It says the contractor will be responsible. I am responsible for the total operation and completion by signing the contract, carried out through other people. This transformer wasn't on our job. I wasn't responsible for it.
Q. But wasn't it part of the work, and didn't it become part of the work to hook up the low voltage side?
A. No. it was not.
Q. It was never part of that
A. It was not a part of our contract. We were pressured into hooking it up. And all we did was remove a wire, some wires, and put some right back in place. It was in operation, hooked up when we went there. We just changed it from one panel to another, I believe is what the electrician explained.
Q. Go back to Page GC-8 at the beginning.
A. GC-8. All right.
Q. What we talked about a while ago, does it not say all the work and all the materials or equipment to be incorporated therein?
A. Those words are in this paragraph. If you're asking if this transformer or its hook up was incorporated herein, it was not. It was not a part of our work.
The testimony, reproduced above, supports the jury's finding that the new transformer was not part of the Byers/Ebarb contract. The contract between Byers and Ebarb was signed on April 2, 1990. Approximately two months later and after realizing the existing transformer was inadequate, the engineers on the project asked Byers to "furnish, install and start-up" a new transformer. Byers gave a proposal to remove the old transformer and provide a new one. This proposal was rejected.
Byers performed no actual hands-on work on the new transformer. Byers testified when J.D. Electric hooked up the low voltage connections on the 100 KVA transformer, he was just "looking around, looking over." According to Byers he did not pay much attention to the transformer because it was not "in his area of expertise."
Still, plaintiffs urge we should assign liability to Byers, vicariously, for J.D. Electric's actions. This argument is without merit. Employers, including general contractors, are not vicariously liable for the torts committed by independent contractors. Salard v. Jim Walter Homes, Inc., 563 So.2d 1327, 1331 (La.App. 3 Cir.1990).

4. Fault of Arkansas Transformer
Plaintiffs argue the jury erred in allocating ten (10) percent fault to Arkansas Transformer, the seller of the 100 KVA transformer. They ask that this court reduce the fault assigned to Arkansas Transformer to five (5) percent.
La.R.S. 9:2800.53(1)(a), defining "manufacturer," states the term includes "a person or entity who labels a product as his own or who otherwise holds himself to be the manufacturer of the product." When Arkansas *507 Transformer put their label on the transformer, they accepted the same responsibilities as a manufacturer. Plaintiffs do not assert that Arkansas Transformer is free from fault. Plaintiffs argue that we should assign less fault to Arkansas Transformer than they urged the jury to assign during closing argument. We are not persuaded at this late stage in the proceedings to "second guess" the jury's fault assessments or to adjust upward by "appellate tinkering" the dollar amount plaintiffs may legally demand from each solvent defendant to fully satisfy the jury's awards.

5. Fault of Sabine River Authority
The record reveals the SRA is classified by the Federal Energy Regulatory Commission as a utility entity, and to some extent it is regulated by the Louisiana Public Service Commission. As such, plaintiffs contend the jury erred in assigning any fault to the Sabine River Authority (SRA) for causing the accident. Citing La.R.S 9:2800 and La.Civ.Code art. 2317, plaintiffs assert the SRA (as a governmental agency) is statutorily immune from strict liability as owner and operator of the new transformer unless sufficient evidence exists to establish that it had actual or constructive knowledge of the transformer's defective condition.
Plaintiffs assert the SRA did not issue any commands relating to removing the old transformer and replacing it with a new one. The testimony does not support this contention entirely. Barton Rumsey, who worked for the SRA as the Project Engineer for the Toledo Bend Project, testified as follows:
Q. Can you tell me whether or not the Sabine River Authority gave its authorization for the removal of its transformer and the replacement of the new one?
A. Yes, they did.
Q. Would you agree with me that the Sabine River Authority would not want a transformer anywhere in its park site that was not properly manufactured?
A. Oh, yes, sir.
Q. Okay. Did youdid the Sabine River Authority do anything to make sure that the replacement transformer, the new transformer, was properly manufactured?
A. No, sir.
While admitting ordinarily owners and operators share a high standard of care in possessing and using high-voltage equipment, nevertheless plaintiffs argue La.R.S. 9:2800 absolves the SRA from strict liability for the injury caused because it lacked knowledge of the dangers posed by the new transformer. However, a public entity may not ignore or fail to take reasonable and timely steps to discover apparent or obvious defects in the things they own, possess, or operate and escape liability by relying on the notice requirement of La.R.S. 9:2800. Fox v. Housing Authority of New Orleans, 605 So.2d 643, 646 (La.App. 4 Cir.), writ denied 607 So.2d 570 (La.1992); Alexander v. Rivers, 560 So.2d 999, 1001 (La.App. 4 Cir.1990). We do not find the jury manifestly or legally erred in finding the Sabine River Authority 10% at fault in causing the accident.

SOLIDARITY
As mentioned, the jury assigned B & B Transformer, Arkansas Transformer and J.D. Electric Company 25%, 10%, and 5% fault, respectively, in causing Oxley's injury. Accordingly, the trial court rendered judgment against these defendants, in solido, for 40% of the total damages awarded plaintiffs. J.D. Electric complains the trial court's in solido judgment, in effect, forces it to bear full responsibility for 40% of the damages awarded plaintiffs, although the jury found it only 5% at fault. This is so, J.D. Electric argues, because the other two remaining joint tortfeasors (B & B Transformer and Arkansas Transformer) alleged insolvency and it "will be unable to exercise any contribution rights against" the released solvent defendants. J.D. Electric insists it should not be held accountable for 40% of the total award because it "should bear some, but not all of the burden of the insolvent obligors." This burden, J.D. Electric urges, "must be borne by the solvent solidary obligors in proportion to their fault." Louisiana Civil Code Article 1806.
In 1987, the Legislature amended Louisiana Civil Code Article 2324 to "[address] the problem of burdening solvent defendants, who were minimally or not exclusively liable, *508 with 100% of a plaintiff's damage." As amended the article read:
A. He who conspires with another person to commit an intentional or willful act is answerable, in solido, with that person, for the damage caused by such act.
B. If liability is not solidary pursuant to Paragraph A, or as otherwise provided by law, then liability for damages caused by two or more persons shall be solidary only to the extent necessary for the person suffering injury, death, or loss to recover fifty percent of his recoverable damages; however, when the amount of recovery has been reduced in accordance with the preceding Article, a judgment debtor shall not be liable for more than the degree of his fault to a judgment creditor to whom a greater degree of fault has been attributed. Under the provisions of this Article, all parties shall enjoy their respective rights of indemnity and contribution. Except as described in Paragraph A of this Article, or as otherwise provided by law, and hereinabove, the liability for damages caused by two or more persons shall be a joint, divisible obligation, and a joint tortfeasor shall not be solidarily liable with any other person for damages attributable to the fault of such other person, including the person suffering injury, death or loss, regardless of such other person's insolvency, ability to pay, degree of fault, or immunity by statute or otherwise.
While preserving in solido liability among joint tortfeasors, the amendment in effect limits their individual exposure for the payment of plaintiff's recoverable damages to fifty percent, as opposed to one hundred percent.
Acknowledging the Legislature amended Article 2324, plaintiffs maintain J.D. Electric's individual exposure for payment of their recoverable damages does not exceed fifty percent. Thus, plaintiffs contend they legally may demand that J.D. Electric alone, as a solidary obligor, pay 40% of the total amount awarded them which is less than 50% of their "recoverable damages."
J.D. Electric concedes Louisiana Civil Code article 2324, as amended, when literally read allows a plaintiff to demand from any solidary obligor fifty percent of his recoverable damages. However, J.D. Electric argues plaintiffs' action in releasing or settling with UDS, SRA, and CLECO prior to trial has prejudiced its right to demand contribution from them in proportion to their fault to cover the loss arising from the insolvency of the two remaining solidary obligors.
Louisiana Civil Code articles 1803 and 1804, enacted in 1985, provide:
Article 1803
Remission of the debt by the obligee in favor of one obligor, or a transaction or compromise between the obligee and one obligor, benefits the other solidary obligors in the amount of the portion of that obligor.
Surrender to one solidary obligor of the instrument evidencing the obligation gives rise to a presumption that the remission of debt was intended for the benefits of all the solidary obligors.
Article 1804
Among solidary obligors, each is liable for his virile portion. If the obligation arises from a contract or quasi-contract, virile portions are equal in the absence of agreement or judgment to the contrary. If the obligation arises from an offense or quasi-offense, a virile portion is proportionate to the fault of each obligor.
Consistent with these provisions, Louisiana courts have stated "when a plaintiff settles with and releases one of several joint tortfeasors, he thereby deprives the remaining obligors of the right to contribution against the released obligor." Taylor v. U.S. Fidelity and Guaranty Company, 630 So.2d 237 (La. 1993). Accordingly, "the rule emerged that a plaintiff's settlement with one solidary obligor reduces his recovery against the remaining obligor by the percentage of the proportionate fault of the released obligor." Buckbee v. Aweco, Inc., 614 So.2d 1233 (La.1993); Dill v. State, DOTD, 545 So.2d 994 (La.1989).
Plaintiffs maintain they are not demanding that J.D. Electric pay any portion of their losses attributable to the fault of the released co-tortfeasors. Their combined fault has been established by jury verdict as equaling 60%; and, thus, plaintiffs assert they seek to *509 collect only 40% of their recoverable damages from J.D. Electric. Nevertheless, J.D. Electric asserts it is still prejudiced by plaintiffs' action because Louisiana Civil Code article 1806 also grants it the right to demand additional contributions from the released obligors to recoup a portion of the loss arising from the insolvency of B & B Transformer and Arkansas Transformer. Ultimately, J.D. Electric argues, it would bear financial responsibility for only 7.69% of plaintiffs' recoverable damages instead of 40%.
Louisiana Civil Code article 1806 reads:
A loss arising from the insolvency of a solidary obligor must be borne by the other solidary obligors in proportion to their portion.
Any obligor in whose favor solidarity has been renounced must nevertheless contribute to make up for the loss.
The issue J.D. Electric encourages us to entertain is one of first impression. As noted in the Revision Comments to article 1806: "There is virtually no Louisiana jurisprudence on the issue of the effect of the insolvency of one solidary obligor." Plaintiffs point further to the commentator's caution that:
"Nevertheless, it is important to specify who should bear the loss in such a case, especially when the obligor who becomes insolvent is one upon whose solvency an obligee has relied in releasing a co-obligor. Without the protection afforded by this Article, obligees might be unwilling to discharge any obligor until fully satisfied by all, even in cases in which obligee is otherwise willing to accept piecemeal payment."
They contend article 1806 was enacted to protect the obligees, here the plaintiffs. By its adoption, the legislature merely intended, plaintiffs urge, "to state that the co-obligors have to share in the loss of insolvency, not the innocent plaintiff."
We admit the issue raised is troublesome. The time, however, has not come for us to ponder longer on it because the record does not contain sufficient evidence to establish that any of the defendants cast in judgment are insolvent. J.D. Electric failed to affirmatively raise this issue by pleading; and, it further failed (during trial) to present any evidence showing that B & B Transformer and Arkansas Transformer are insolvent.
As noted in Raley v. Carter, 412 So.2d 1045 (La.1982), "our courts have repeatedly refused to implement jurisprudential rules which would reduce plaintiff's incentive to reach settlement with defendants without the need for trial." Although the remaining obligors' right to demand contribution from co-tortfeasors may be prejudiced when plaintiffs settle with or release them prior to trial, the courts have long held they are entitled to a reduction only "when [they] prove at trial that the released party was a joint tortfeasor and therefore solidarily liable." Taylor v. U.S. Fidelity & Guaranty Co., 630 So.2d 237 (La.1989); Raley v. Carter, supra. We find no compelling reasons why this evidentiary requirement should not apply in this case. It matters not whether the remaining obligors' right of contribution against the released obligors exists because of solidarity or insolvency. J.D. Electric failed to present any evidence during trial to establish the alleged insolvency of B & B Transformer and Arkansas Transformer; and, thereby establish its entitlement to additional contributions from the released solidary obligors. Without such evidence in the record, we are prevented from reducing plaintiffs' right to recover 40% of their recoverable damages from J.D. Electric. It does not matter that B & B Transformer and Arkansas Transformer pled they lack insurance sufficient to cover their potential exposure or money to pay counsel of record. Raley v. Carter, supra. at 1047. These defendants' unsubstantiated pleas are "hollow cries."

QUANTUM
The Louisiana Supreme Court in Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993), cert. denied, ___ U.S. ___, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994), thoroughly examined the standard for appellate review of general damage awards and stated as follows:
The theme that emerges from Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149 (La. *510 1963), through Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976), and through Reck to the present case is that the discretion vested in the trier of fact is "great," and even vast, so that an appellate court should rarely disturb an award of general damages.... It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award.
In Reck v. Stevens, 373 So.2d 498 (La.1979), the Louisiana Supreme Court looked with disfavor on the use of award scales based on prior cases. The court stated "such a hypothetical scale of hypothetical awards cannot be used to determine whether or not this trier of fact has abused its discretion in the award to this particular plaintiff under the facts and circumstances peculiar to this case." Reck, at p. 500-501. Only after a determination of an abuse of discretion is a resort to prior awards appropriate. Youn, at p. 1260. After reviewing the record, we find the jury's damage awards are supported by the evidence.

Truman Oxley's Damages
J.D. Electric appeals the jury's award of damages to Oxley claiming it is excessive. Plaintiffs have answered the appeal and allege Oxley's awarded damages are inadequate. We find both contentions without merit.
Immediately after this mishap, Oxley was transported to Sabine Medical Center in Many. Because his injuries were so severe, Oxley was transported by helicopter to Schumpert Medical Center in Shreveport. In route, Oxley's vital signs "straight lined" twice. During his stay at Schumpert, his badly burned body required continual whirlpool baths daily. Damage to Oxley's toes eventually required removal of the lower half of his right leg. Oxley's left leg also was damaged, essentially rendering it non-functional. He sustained an eye injury, as well, which initially limited his focus. Oxley's vision continued to weaken and his ability to focus became more restricted. The physicians later discovered Oxley's cornea was damaged. As a result Oxley's cornea tissue was dying slowly, causing detachment of his retina. Four surgical procedures were performed in an attempt to save Oxley's vision, before he suffered complete loss of vision in the affected eye.
Oxley spent 99 days in the hospital, and underwent over 30 surgical procedures. He is totally blind as a result of the accident.[2] His whole body disability rating is 93%.
We cannot say the jury's damage awards to Truman Oxley were excessive or shockingly high. Neither are we convinced the awards are inadequate or shockingly low.

Bessie Oxley's Consortium Award
The jury awarded Bessie Oxley $500,000 for loss of consortium and household services. J.D. Electric contends this award is abusively high. It argues Louisiana courts do not favor high consortium awards, citing cases with similar facts and lower consortium awards.
In reviewing awards for loss of consortium, appellate courts must give great deference to the trier of fact's determination:
"In general, courts approach loss of consortium claims in much the same manner as they approach considerations of general damages for pain and suffering, of the party actually suffering physical injury. The considerations are highly subjective. The appellate courts tend to rely heavily on the impressions of the trier of fact (citations omitted).... In such cases the courts stress the rule that trial courts have great discretion in assessing damages that cannot be calculated with certainty and the formulation of such damages is enhanced by the parties' demeanor." Johnson v. Aetna Casualty & Surety Co., 575 So.2d 458, 465 (La.App. 3d Cir.), writ denied 578 So.2d 934 (La.1991).
J.D. Electric cites Bergeron v. Blake Drilling & Workover Co., 599 So.2d 827 (La.App. 1 Cir.), writ denied, 605 So.2d 1117, 1119 (La.1992), to support its argument. In Bergeron, *511 there was a premature explosion of a perforation gun on a drilling rig. As a result of the explosion, Smith lost his right leg below the knee, a part of his little finger on his left hand, a large amount of soft tissue, bone tendon and ligament from his left foot. Additionally, he had shrapnel lodged in his right eye and multiple shrapnel wounds to the front of his body and face. Smith spent 49 days in the hospital and underwent nine surgical operations. His whole body disability rating was assigned at 36%. A jury awarded Mrs. Smith $500,000 for loss of consortium. Noting the award was higher than any previously rendered in this state, for loss of consortium, the Bergeron court reduced Mrs. Smith's award to $100,000.
The special facts of this case support an award much higher than rendered in Bergeron. Truman Oxley spent 99 days in the hospital, followed by a stay in the rehabilitation unit. He also underwent over 30 surgeries. He lost one leg, and has virtually no feeling in the other leg. Today he is totally blind as a result of the accident. Oxley has been assessed a 93% disability rating of his whole body.
Mr. and Mrs. Oxley were planning to retire in the Toledo Bend area, to spend the rest of their life fishing and enjoying the pleasures that area has to offer. Obviously, as a result of this accident, the Oxleys' plan for their "golden years" will not materialize and their lives have been drastically altered. While Mrs. Oxley testified their love for each other has remained undaunted, their relationship as husband and wife has changed to patient and nurse. Mr. Oxley requires constant care. Even using the bathroom is difficult for him and he requires assistance. We cannot say the consortium award in this case is grossly excessive and shocking even though it exceeds any amount previously awarded.

DECREE
For the foregoing reasons, the judgment of the lower court is affirmed. All costs of this appeal are assessed against defendant-appellant.
LABORDE, J. Pro Tem., concurs in the result.
WOODARD, J., concurs in part and dissents in part and assigns reasons.
WOODARD, J., concurring in part and dissenting in part.
The majority's opinion failed to address plaintiff's assignment of error number four, in which he complains that "the jury committed an error of fact and/or law by failing to award the entire amount of future medical care determined by expert testimony when there was no contradictory expert testimony in the record." The majority discusses the jury's award of general damages but is silent regarding this special damage.
Plaintiff's assignment has merit. Defendants were found liable for his damages. As such, they owe him, in full, his resulting damages, past, present, and future, which he proves. "The uncontradicted testimony of a witness should be accepted as true, absent a sound reason for its rejection." Jaffarzad v. Jones Truck Lines, Inc., 561 So.2d 144 (La. App. 3 Cir.), writ denied, 565 So.2d 450 (La.1990). Mr. Oxley's evidence in this regard was uncontradicted.
The jury made an in globo award for a multitude of future expenses, but it is obvious that their calculation for the cost of an attendant was based on an hourly amount not in evidence. Dr. Bicknell, who is the chief of the rehabilitation unit at the medical center where Mr. Oxley has been receiving his care, testified that a permanent, round-the-clock attendant for Mr. Oxley is mandatory due to his total blindness, confinement to a wheel chair, and 93% disability; and based on his experience and that of his case manager, who frequently oversees the hiring of these attendants, the cost ranges from $8.50 to $9.00 per hour. Mr. Oxley's economist chose the mid-point to do his calculations for future medical costs, which came to $929,094.00. He then added this amount to other future costs of $108,042.00, proven by Mr. Oxley, totalling $1,037,136.00. The jury only awarded $638,953.00, which includes the cost for a full time attendant, calculated at $5.00 per hour, totalling $530.911.00 at present value, plus $108,042.00 for other future expenses. There is absolutely no evidence in *512 the record to support a calculation of $5.00 per hour. In fact, Dr. Bicknell testified that these attendants receive "definitely more than the minimum wage" (emphasis added), and defendants did not put on ANY evidence to the contrary. They simply made a hypothetical reference during the testimony of the economist, who has no expertise in hiring attendants. He was asked "And hypothetically, if someone was to testify that in Sabine Parish the price is five dollars instead of $8.75 an hour, you wouldn't disagree with that, would you?" The jury was obviously misled by this because no one ever put on any evidence that the cost would be $5.00. I also note that, while one of the functions of this type of employee is akin to that of a "sitter," the enormous responsibility and physical demands placed on an attendant make it a remarkably different job.
An argument was made that Mr. Oxley's wife, who is approximately 68 years old, could do this work. This may be partially so for now, but she was not performing this function prior to Mr. Oxley's injuries, and she is under no legal obligation to take on this great burden, which essentially means being on call for 24 hours a day for seven days a week, 365 days every year. Surely, while Mrs. Oxley may be willing to do what she can, it is not reasonable to expect this senior citizen to give up the remainder of her life in this way when the responsibility and liability to fully compensate Mr. Oxley for damages caused by defendants are that of defendants. They should neither benefit nor have their responsibility diminished by a potential collateral source.
I submit that the jury saw fit to award Mr. Oxley this damage for a full time attendant but failed to calculate it in accordance with the evidence and law; thus, that portion of the award should be increased from $638,953.00 to $929,094.00, added to $108,042.00, totalling $1,037,136.00.
NOTES
[*] Judge P.J. Laborde, Retired, participated in this decision by appointment of the Louisiana Supreme Court as Judge Pro Tempore.
[1] A live-front transformer is one in which the bushings on the high voltage side are exposed. A dead-front transformer is one in which the bushings are covered. A live-front transformer is inherently more dangerous than a dead-front transformer.
[2] Oxley was blind in one eye prior to the accident.