STATE OF LOUISIANA

COURT OF APPEAL, THIRD CIRCUIT

18-546

NOT FOR PUBLICATION

**ABBY GAIL GARCIA**

**VERSUS**

**CITY OF NATCHITOCHES, ET AL.**

\*\*\*\*\*\*\*\*\*\*\*\*

**APPEAL FROM THE**

**TENTH JUDICIAL DISTRICT COURT**

**PARISH OF NATCHITOCHES, NO. 86682**

**HONORABLE LALA B. SYLVESTER, DISTRICT JUDGE**

\*\*\*\*\*\*\*\*\*\*\*\*

**SYLVIA R. COOKS**

**JUDGE**

\*\*\*\*\*\*\*\*\*\*\*\*

Court composed of Sylvia R. Cooks, Shannon J. Gremillion, and Phyllis M. Keaty, Judges.

**JUDGMENT AFFIRMED IN PART AND REVERSED IN PART.**

T. Taylor Townsend
T. Taylor Townsend, LLC
P.O. Box 784
Natchitoches, LA  71458-0784
(318) 238-6103
  Attorney for Appellant, Abby Gail Garcia

Ronald E. Corkern, Jr.
Corkern, Crews, Guillet & Johnson, LLC
P.O. Box 1036
Natchitoches, LA  71457-1036
(318) 352-2302

**Attorney for Appellee, City of Natchitoches**

**James A. Mijalis**
**Lunn Irion Law Firm, LLC**
**P.O. Box 1534**
**Shreveport, LA  71165**
**(318) 222-0665**
  **Attorney for Appellee, Scallion Heating,**
  **Air Conditioning, and Electrical, Inc.**

**COOKS, Judge.**

## FACTS AND PROCEDURAL HISTORY

Abby Gail Garcia (Garcia) purchased a vacant house in Natchitoches and hired the services of JTD Construction (JTD), general contractor, to handle the remodel of her newly acquired home. Jim Davis (Davis), Garcia's uncle, was in charge of the project and obtained a building permit from the City of Natchitoches (City). JTD subcontracted the services of Scallion Heating, Air Conditioning, and Electrical, Inc. (Scallion) to perform the electrical and heating/cooling system upgrades to the residence. Scallion determined that the existing underground electrical supply to the residence was inadequate to meet the needs of the planned improvements. The City issued a building permit for the project on November 26, 2012, and renovations began shortly thereafter. In the process of renovating the residence Scallion installed a new meter base and new breaker box. The City was responsible for providing electrical service from its transformer to the residence for the new overhead service and for disconnecting the old underground service to the old meter base on the residence.

On December 6, 2012, the City's building inspector, Johnny White (White), inspected Scallion's installation of the new weather-head and riser pole at the residence. The work passed inspection and White affixed a green sticker to the new meter base. Scallion's representatives at the residence, Brad Calvert (Calvert) and Danny Thomas (Thomas) were present for the inspection. At that time, they informed White they had removed the old meter and secured the wires on the old meter base. They also informed White that the old underground service to the residence was still "hot" meaning it had not been disconnected from the City's utility pole. White assured them he would put in a work-order directing the old service be

disconnected at the same time as the new overhead service would be connected. White issued a work-order dated December 10, 2012, expressly instructing the City's personnel to "pull overhead service line to new service riser and meter" and to "disconnect [the] old service." On December 17, 2012, a crew of workmen for the City electrical department performed the work necessary to connect the new overhead service to the residence from the City electrical source. Despite the instruction in the work-order, the City's crew did not disconnect the old underground service to the residence but instead left it "hot."

Calvert and Thomas intended to remove the old meter base after completing the startup of the new air conditioning equipment, but when they attempted to do so they discovered the City had not disconnected the old meter base from the City's electrical source. Calvert informed White that the City workers had not disconnected the old source. White assured him he would address the situation. Scallion completed its work at the residence on December 28, 2012. Garcia took up residence in her newly renovated home, despite the fact that Davis did not request a final inspection of the project from the City. On January 24, 2013, Garcia was doing some work in her flower beds and decided she wanted to remove the unsightly old meter base and its riser pole from her house. She telephoned Davis and asked if it was safe for her to remove the old meter box and pole. Davis, without knowing whether the old service was disconnected or not, but *assuming* it was, informed her it was safe to proceed. Garcia began pulling on the riser pole, moving it back and forth attempting to pull it away from the house and out of the ground. She heard "rumbling" sounds from the ground and felt the ground "shaking." When she allegedly saw sparks and smoke coming from the pole, she immediately turned loose of the pole fearing for her safety. Garcia was frightened by the event, and, along with Sharon Durham (Durham), phoned 911. A City utility worker, Lee McKinney

2

(McKinney), responded immediately to the call. After confirming that the old service line to Garcia's residence was still "hot," McKinney disconnected the old electrical service line from the City power source. Later that evening Garcia drove herself to Natchitoches Regional Medical Center where she sought medical attention in the emergency room. She informed the ER doctor that she *believed* she was suffering from electrical shock. The doctor found no visible signs of electrical shock or any injury and discharged Garcia with instructions to see her normal physician if necessary.

Several days later when Durham was again at Garcia's residence, Garcia solicited Durham's help to support her allegation that she suffered an electrical shock during her attempt to remove the old riser pole. According to Durham, Garcia offered to pay her monetary compensation in return for Durham confirming in writing that Garcia suffered an electrical shock while trying to remove the old riser pole. According to Durham, she refused Garcia's offer because Garcia was not shocked during the incident and acknowledged as much at the time of the event. Durham was subsequently terminated from her job by Garcia who was her supervisor at the time.

Garcia filed suit against the City and Scallion but asserted no claim against JTD or her uncle, Davis. Garcia alleged she suffered an electrical shock during the incident of January 24, 2013 at her home and that this caused aggravation to her pre-existing medical conditions. Following a bench trial, the trial court found JTD 100% liable for the accident and found Garcia was not physically injured as any result of the accident. The trial court awarded Garcia $3500 for the fear and mental anguish she suffered during the incident. Garcia appeals the trial court judgment alleging four assignments of error as follows:

3

1.  The Trial Court erred in finding that Abby Garcia's injuries were not caused by the City of Natchitoches, nor Scallion Electric (sic) breach [of] their duty to her.

2.  The Trial Court erred in its allocation of fault under the Watson (sic) Factors.

3.  The Trial Court erred in its finding that Abby Garcia's injuries were not caused by the electrical shock she sustained on January 24, 2013.

4.  The Trial Court erred in awarding damages by awarding Ms. Garcia only nominal damages, given the nature of the electrical shock injury Ms. Garcia sustained, and the strong evidence of wrongdoing on the part of defendants.

## LEGAL ANALYSIS

*Liability*

After a thorough review of the record we find the trial court erred in assigning 100% liability to JTD. As the provider of electrical services, the City owed a "high degree of care" to Garcia as its customer. *Weaver v. Valley Elec. Membership Corp.*, 615 So.2d 1375, 1381 (La.App. 2 Cir. 1993). The Louisiana Supreme Court has described the duty of suppliers of electricity to their customers as requiring them "to *exercise the utmost care* to reduce hazards to life as far as practicable." *Hebert v. Gulf States Utils. Co.*, 426 So.2d 111, 114 (La.1983) *citing Simon v. Southwest La. Elec. Membership,* 390 So.2d 1265 (La.1980) and *Nessmith v. Central La. Electric Co.,* 257 So.2d 744 (La.App. 3d Cir.), *writ denied*, 261 La. 480, 259 So.2d 921, 922 (1972) (emphasis added).

> A power company is held to the standard of a reasonable person *with superior attributes*, and is required to realize that there will be a certain amount of negligence that must be anticipated. *Green v. Claiborne Elec. Co-op., Inc.,* 28,408 (La.App.2d Cir.6/26/96), 677 So.2d 635.
>
> Accordingly, a power company has an obligation to make reasonable inspections of wires and other instrumentalities in order to discover and remedy hazards and defects; consequently, a company will be considered to have constructive knowledge of an electrical hazard which has existed for a period of time which would reasonably permit discovery had the company adequately performed its

4

duties. *In re New Orleans Train Car Leakage Fire Litigation,* 00-0479 (La.App. 4th Cir.6/27/01), 795 So.2d 364.

*Pillow v. Entergy Corp.*, 36,384, pp. 5-6 (La.App. 2 Cir. 9/18/02), 828 So.2d 83, 87, *writ denied*, 02-2575 (La. 12/13/02), 831 So.2d 987 (emphasis added).

Although our courts have established this high degree of care, the determination of negligence on the part of the provider of electrical services is addressed under La.Civ.Code art. 2316. It has not been treated as strict liability. Nevertheless, our courts have held that: "A presumption of foreseeability through constructive knowledge of the risk of an electrical hazard existing for a reasonable time has made the negligence standard of 'utmost care' virtually indistinguishable from strict liability." *Weaver*, 615 So.2d at 1381.

> The Civil Code addresses negligence, a species of tort liability, in Article 2316, which states that "[e]very person is responsible for the damage he occasions not merely by his act, but by his negligence, his imprudence, or his want of skill." *See Myers v. Dronet,* 01–5 (La.App. 3 Cir. 6/22/01), 801 So.2d 1097. In order to prevail in a negligence cause of action brought under La.Civ.Code art. 2316, an aggrieved party must meet the following five-pronged test, as outlined by a panel of this court in *Myers,* 801 So.2d at 1104:

> > (1) the delictual conduct was the cause-in-fact of the damage or injury; (2) the defendant owed the plaintiff a duty under the specific circumstances of the particular case; (3) the particular defendant breached the duty which s/he owed the particular plaintiff; (4) the risk and resulting harm stood within the scope of protection of the defendant's duty; and (5) the plaintiff showed actual damage.

*Vermilion Par. Police Jury v. Albert*, 03-1420, p. 4 (La.App. 3 Cir. 3/3/04), 867 So.2d 67, 70.

There can be no question here that the City's failure to de-energize the supply line from its transformer to Garcia's residence was a cause-in-fact of the incident. The testimony established *only the City had the authority, responsibility, and ability to de-energize the supply of electricity from its transformer to Garcia's residence.*

5

Neither the homeowner, Davis, nor Scallion possessed the expertise, authority, or wherewithal to de-energize the underground power line. Scallion did the most that it could do to fulfill its duty to Garcia when it disconnected service from the old meter box into the residence and taped up the wires to ensure no one would get shocked if they tampered with the meter box. Additionally, the City's failure to follow through on its own work-order directing its workers to disconnect the electrical supply from its source of power to Garcia's residence further evidences its negligent behavior. The City provides an excuse for its failure to disconnect the old service on its first visit made to Garcia's residence for that purpose, i.e., no one was present at the residence on that date. But the City had months of opportunity to re-visit the residence while the electricians were working on the jobsite and no excuse is offered for their failure to do so. Likewise, the City's reliance on the failure of Davis or Garcia to request a final inspection of the home before occupancy does not excuse the City's negligence and complete failure to do its job. The City owed a duty to Garcia to make sure the old service to her residence was disconnected after it installed and energized the new service to her residence. It breached this duty to Garcia when it failed to de-energize the old underground service to her residence. Even after Scallion informed the City that the old service was not de-energized the City failed to disconnect the old service, despite having many weeks to do so on any given day of the week, and despite its supervisor's promise to see that it would be done. Additionally, the risk that a homeowner would come into contact with the energized old service line was well within the scope of the City's heightened duty to safeguard its customer from such an occurrence. Thus, we find the City is comparatively at fault for the incident.

We also find the trial court correctly determined that Garcia was not comparatively negligent in causing the incident. In *Hebert*, 426 So.2d at 1381, the

6

appellate court found no contributory negligence on the part of the plaintiff who came into contact with a high voltage wire. The appellate court explained:

> Working near electrical power lines is neither contributory negligence per se nor assumption of the risk. Likewise, the fact that a person's own actions bring him in contact with high voltage wires does not necessarily make him negligent. The question, as enunciated in *Dyson v. Gulf Modular Corporation,* 338 So.2d 1385 at 1390 (La.1976) is whether "the party's conduct conform[ed] to the standard of care that would be exercised by a reasonable man; or did the conduct breach a duty imposed upon the party to protect against the particular risk from which the accident resulted?" In other words, did the plaintiff Hebert breach a duty to himself by failing to avoid the unreasonable risk created by the defendant utility company? We find that he did not.

> . . . .

As aptly stated in *Hall, supra* at 799:

> When the party charged with the responsibility of observing safety factors fails to do so, it is grossly unjust to place the blame for a resulting accident on the person who poured the last cup of water before the defective dam broke, unless that person also exercised a substantial amount of knowledgeable control over the dangerous situation. There was no such knowledge or control by plaintiff in the present case.

Likewise, Garcia exercised no knowledge or control over the dangerous situation created by the City's failure to disconnect the old underground service, as it had the sole responsibility to do. The City's utility personnel visited Garcia's home on multiple occasions and had ample opportunity to de-energize the old service. The meter was removed from the old meter box and a meter was installed on the new meter box with a green approval tag affixed to the new meter by the City indicating to the homeowner that the electrical service was now being provided to her home through the new overhead line and new meter box. Garcia could not know—nor should she have assumed—that the City had failed to follow its own work-order for her service disconnect and failed to exercise the heightened responsibility it owed to safely provide electrical power to her home. As we have

7

already noted, Garcia had no control over the de-energizing of the service to her home. Moreover, Garcia exercised more than reasonable caution in contacting Davis, her contractor, to inquire as to whether it was safe for her to remove the old riser pole and meter base from her residence.

> Generally, negligence is defined as conduct which falls below the standard established by law for the protection of others against an unreasonable risk of harm. *Dobson v. Louisiana Power and Light Company,* 567 So.2d 569 (La.1990). A particular unforeseeable risk may be included within the scope of a duty if the injury is easily associated with the rule relied on and with other risks of the same type that are foreseeable and clearly within the ambit of protection. *Forest v. State, thru La. Dept. of Transportation,* 493 So.2d 563 (La.1986).
>
> In reviewing a determination that negligence exists, the reviewing court must consider *the ease with which it can associate the duty owed and the risk encountered, whether the breached duty was a substantial cause and whether the risk is reasonably foreseeable.* See, *Sibley v. Gifford Hill and Co. Inc.,* 475 So.2d 315 (La.1985); *Dunne v. Orleans Parish School Board,* 463 So.2d 1267 (La.1985).

*Vermilion Par. Police Jury*, 867 So.2d at 70-71, quoting *Maeder v. Williams*, 94-754 (La.App. 4 Cir. 11/30/94), 652 So.2d 1005, *writ denied* 94-3150 (La.3/10/95), 650 So.2d 1177 (emphasis added).

Garcia's attempt to disconnect the old, unsightly, riser pole and meter box from her residence once the new overhead service had been activated was reasonably foreseeable and the ease of association between Garcia's action and the City's duty to de-energize the old service is too clear for further comment.

We also find the trial court did not err in finding Davis[1] negligent in telling Garcia that it was safe for her to proceed in light of the admitted fact that he did not know whether or not the old service was de-energized by the City. His negligent behavior is further exemplified by the fact that, according to his own testimony, he

---

[1] "In any action for damages where a person suffers injury, death, or loss, the degree or percentage of fault of all persons causing or contributing to the injury, death, or loss shall be determined, regardless of whether the person is a party to the action or a nonparty. . ." La.Civ.Code art. 2323.

telephoned Scallion to inquire as to whether it was safe for Garcia to proceed and was told it was not. He offered no explanation as to why he did not attempt to contact Garcia and warn her not to proceed. We find Davis' actions were a contributing cause of the incident. But, as we have explained, Davis was not solely at fault, and the trial court erred in finding him 100% liable. We find the City and Davis are each 50% contributorily negligent for the incident experienced by Garcia.

*Damages*

The fifth element which a court must determine in negligence cases is whether a plaintiff suffered any damage as a result of a defendant's negligence. The trial court found Garcia was not electrocuted and suffered no injury as the result of any electrocution. Our thorough review of the record finds no manifest error in the trial court's ruling in this regard.

> The standard of review which we must apply in examining the factual conclusions of a trier of fact was articulated by our Supreme Court in *Rosell v. ESCO,* 549 So.2d 840 (La.1989), and recently reiterated in *Stobart v. State, Through Department of Transportation and Development,* 617 So.2d 880 (La.1993):
>
> > A court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong." *Rosell v. ESCO,* 549 So.2d 840 (La.1989). This court has announced a two-part test for the reversal of a factfinder's determinations:
> > 1) The appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and
> > 2) the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous).
> >
> > . . . [T]he issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one.
> >
> > . . . .
> >
> > Even though an appellate court may feel its own evaluations and inferences are more reasonable than the factfinder's, reasonable evaluations of credibility and

9

reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. *Rosell v. ESCO,* 549 So.2d 840 (La.1989); *Arceneaux v. Domingue,* 365 So.2d 1330 (La.1978)... Nonetheless, this Court has emphasized that "the reviewing court must always keep in mind that 'if the trial court or jury's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.' " *Housley v. Cerise,* 579 So.2d 973 (La.1991) (quoting *Sistler v. Liberty Mutual Ins. Co.,* 558 So.2d 1106, 1112 (La.1990)).

*Oxley v. Sabine River Auth.*, 94-1284, pp. 4-5 (La.App. 3 Cir. 10/19/95), 663 So.2d 497, 502, *writ denied*, 96-64 (La. 2/28/96), 668 So.2d 357, and 95-3090 (La. 2/28/96), 668 So.2d 368.

In its reasons for judgment the trial court explained that it did not find Garcia's testimony credible. For the most part, Garcia's testimony regarding her allegation that she was electrically shocked when she tried to remove the old riser pole was contradicted by lay and expert witnesses. Her own treating physician could not establish that any of the medical problems Garcia was experiencing after the incident were a result of her being shocked. He acknowledged these complaints were all longstanding and although he testified that some of her pre-existing conditions *could* be exaggerated by a sufficient electrical shock, he could offer no independent evidence of such shock. He testified he relied solely on Garcia's representation to him that she *thought* she was shocked. He further admitted he had no specialized knowledge about electrical shock but relied only on his general understanding of the effects that a sufficient amount of electricity *could* have on a person *if* they were shocked. He also admitted he did not know what would constitute such a sufficient amount of electricity to result in injury or exaggeration of pre-existing injuries. He admittedly saw no physical evidence that Garcia was electrocuted, and the ER records indicate the same. Additionally, two witnesses testified that Garcia told

10

them at the time of the event and shortly thereafter that she was not electrocuted during the incident, only very frightened. Defendant's expert gave extensive and compelling testimony demonstrating why it was not scientifically possible for Garcia to have been shocked during the incident and no evidence was presented to contradict his expert testimony. The trial court also said it found Durham's expert testimony creditworthy. As an eye witness to the incident, she testified that Garcia attempted to elicit false testimony on her behalf regarding the allegation that she was electrocuted during the incident. Based on her personal observations of Garcia's physical activities, Durham also contradicted Garcia's allegation that she was physically affected by the alleged aggravation of her existing medical problems. We find no basis in the record to disregard the trial court's credibility determinations in this regard nor in any other.

The trial court did, however, find Garcia suffered brief emotional distress as a result of the incident. Here, too, we find no manifest error in the trial court's ruling. Durham corroborated this fact as did other lay witnesses present shortly after the incident. And it is not hard to imagine that the rumbling sounds underground and the sight of water and smoke coming from the old riser pipe as Garcia rocked it back and forth would be a frightening experience. We note in this regard Garcia did not seek immediate medical attention but decided much later in the day to drive herself to the local hospital to be checked out. The medical report from the emergency room indicates there were no visible signs of injury and no need for any immediate medical treatment recommending only that Garcia visit her private physician if or when she deemed it necessary. We reiterate too, Garcia suffered from longstanding pre-existing medical problems and her complaints to the ER doctor are consistent with previous complaints due to those conditions. Nevertheless, Garcia has, to this extent, proven the fifth element necessary to recover damages as a result of the City and

11

Davis' negligence.  The record supports the trial court's award of damages for the fright Garcia experienced as a result of the City and Davis' negligence, and we cannot say the award is abusively low.

## Decree

For the reasons stated, we reverse the trial court judgment on liability and hereby assign fault 50% to Davis and 50% to the City of Natchitoches.  The City is therefore liable to pay Garcia 50% of the damages awarded in the court below.  Because the City is a political subdivision of the State of Louisiana court costs may only be awarded as a specified sum.  We have found the City 50% liable, we therefore assess one-half the costs of this appeal in the amount of $3,379.95 against the City of Natchitoches.

**JUDGMENT AFFIRMED IN PART AND REVERSED IN PART**
**(NOT DESIGNATED FOR PUBLICATION)**